771 A.2d 1163 (2001)
167 N.J. 377
In the Matter of PUBLIC SERVICE ELECTRIC AND GAS COMPANY'S RATE UNBUNDLING, Stranded Costs and Restructuring Filings.
In the Matter of the Petition of PUBLIC SERVICE ELECTRIC AND GAS COMPANY for a Bondable Stranded Cost Rate Order in Accordance With Chapter 23 of The Laws of 1999, To Authorize the Imposition of A Nonbypassable Transition Bond Charge, to *1164 Authorize the Sale of Bondable Transition Property, The Issuance and Sale of not to Exceed $2.525 Billion Aggregate Principal Amount of Transition Bonds by a Financing Entity to Recover Petitioner's Bondable Stranded Costs, and the Application of Transition Bond Proceeds to Retire Outstanding Utility Debt, Equity or Both, and to Approve the Formula for the Calculation and Adjustment of the Transition Bond Charge and Market Transition Charge and Market Transition Charge-Tax Related Thereto.
Supreme Court of New Jersey.
Argued November 8, 2000.
Decided December 6, 2000.
Opinion Filed May 18, 2001.
*1165 Phyllis J. Kessler, New York, NY, for appellant New Jersey Business Users (Kudman Trachten Kessler Newman & Rich and Goldberg, Mufson & Spar, attorneys; Ms. Kessler and Jeffrey L. Kantowitz, on the briefs).
Blossom A. Peretz, Ratepayer Advocate, and Gregory Eisenstark, Deputy Ratepayer Advocate, Newark, for appellant Division of the Ratepayer Advocate (Ms. Peretz, attorney; Mr. Eisenstark, Diane Schulze, Assistant Deputy Ratepayer Advocate and Nusha Wyner, Kurt S. Lewandowski and Ami Morita, Deputy Ratepayer Advocates, on the briefs).
Philip L. Chabot, Jr., a member of the District of Columbia bar, Washington, District of Columbia, for appellant Co-Steel Raritan (Pearson and Shapiro, attorneys).
Helene S. Wallenstein, Senior Deputy Attorney General, Newark, for respondent New Jersey Board of Public Utilities (John J. Farmer, Jr., Attorney General of New *1166 Jersey, attorney; Andrea M. Silkowitz, Assistant Attorney General, of counsel).
John A. Hoffman, Woodbridge, for respondent Public Service Electric and Gas Company (Francis E. Delany, Jr., Corporate Rate Counsel and Wilentz, Goldman & Spitzer, attorneys; Mr. Hoffman, Mr. Delany, James T. Foran, R. Edwin Selover, Anne S. Babineau and Matthew M. Weissman, of counsel and on the briefs).
James E. McGuire, Princeton, for respondent New Jersey Commercial Users (Reed Smith Shaw & McClay, attorneys).
Gerald W. Conway, Morristown, for respondent Jersey Central Power & Light Company, d/b/a GPU Energy (Thelen Reid & Priest, attorneys; Mr. Conway and Marc B. Lasky, of counsel; Pauline Foley, on the brief).
William Harla, for respondent Independent Energy Producers of New Jersey (DeCotiis, Fitzpatrick, Gluck, Hayden & Cole, attorneys).
Michael J. Mehr, Secaucus, for respondent Tosco Refining Company (Waters, McPherson, McNeill, attorneys).
Stephen B. Genzer, Newark, submitted a brief on behalf of respondent Atlantic City Electric Company (LeBoeuf, Lamb, Greene & MacRae, attorneys; Mr. Genzer, Mark L. Mucci and Colleen A. Foley, on the brief).
Murray E. Bevan submitted a brief on behalf of respondent Enron Energy Services, Inc. (Courter, Kobert, Laufer & Cohen, attorneys; Richard P. De Angelis, Jr., on the briefs).
James C. Meyer, Morristown, submitted a letter in lieu of brief on behalf of respondent Rockland Electric Company (Riker, Danzig, Scherer, Hyland & Perretti, attorneys).
PER CURIAM.
Plaintiffs in this case have challenged the August 24, 1999 Final Decision and Order ("Final Order") issued by the Board of Public Utilities ("BPU") in respect of Public Service Electric and Gas Company's ("PSE & G") rate unbundling, stranded cost and corporate restructuring filings. Also at issue is the validity of the BPU's September 17, 1999 Bondable Stranded Costs Rate Order ("BSCRO"), issued in response to PSE & G's petition to securitize its recovery-eligible stranded costs.
The Appellate Division upheld both the BPU's Final Order and BSCRO. Following arguments on November 8, 2000, this Court issued an order disposing of the matter without an accompanying opinion because of the need for an expeditious resolution of the plaintiffs' challenge. That order announced our decision affirming the judgment of the Appellate Division. Although we rely substantially on the reasons expressed in Judge King's thorough and well-reasoned opinion, we take this opportunity to elaborate on that opinion and respond to the concerns of our dissenting colleague.

I
On April 30, 1997, the BPU issued a report entitled "Restructuring the Electric Power Industry in New Jersey: Findings and Recommendations" ("Final Report"). The Final Report recommended in part that by July 2000 all of the state's retail customers should be able to select their electric power suppliers, and that rate reductions of from five to ten percent should be implemented during the phase-in of retail competition. Under the Agency's proposed restructuring, the generation component of electric power production would be competitively priced on the open market.
*1167 The BPU's order adopting the Final Report required the existing four utility monopolies, PSE & G, Jersey Central Power & Light Company, Rockland Electric Company and Atlantic Electric Company, each to submit three filings to the BPU: a rate unbundling petition, a stranded cost petition, and a restructuring plan. The rate unbundling petitions involve the manner in which the single, per-kilowatt-hour charge would be separated into its component parts (generation, transmission and distribution); the stranded cost filings relate to the utilities' right to recover some portion of the overmarket (stranded) costs that would have been recovered had they continued as regulated monopolies; and the restructuring filings relate to the reorganization of the four utilities, focusing on the utilities' divestiture of generating assets, including the valuation of the transferred assets where, as here, those assets are transferred to an unregulated affiliate. The BPU's Final Order addressed PSE & G's submissions and was issued pursuant to the Electric Discount and Energy Competition Act ("EDECA"), N.J.S.A. 48:3-49 to 98,[1] enacted in February 1999.
This is the first case involving one of the state's utility monopolies to receive final agency review. An appeal from the Final Order was taken by the Division of the Ratepayer Advocate ("Ratepayer Advocate" or "RA"), New Jersey Business Users ("NJBUS"), a group of large industrial and commercial customers, and Co-Steel Raritan ("Co-Steel"), one of PSE & G's largest commercial customers. In re PSE & G Co.'s Rate Unbundling, Stranded Costs and Restructuring Filings, 330 N.J.Super. 65, 748 A.2d 1161 (2000). We granted the petitions for certification filed by the Ratepayer Advocate and NJBUS, and granted in part the petition for certification filed by Co-Steel, limited to the issues concerning rate reduction. Certification was denied on Co Steel's contract impairment claim. 165 N.J. 489, 758 A.2d 648 (2000).

II
This case implicates questions of statutory interpretation and executive agency decision making. When considering the meaning of a statutory provision, absent any legislative intent to the contrary, courts must give effect to the language of the provision. Phillips v. Curiale, 128 N.J. 608, 617-18, 608 A.2d 895 (1992); Renz v. Penn Cent. Corp., 87 N.J. 437, 440, 435 A.2d 540 (1981). When a statute is ambiguous, however, "[w]e are... warranted in placing considerable weight on the construction of the statute... by the administrative agency charged by the statute with the responsibility of making it work." The Passaic Daily News v. Blair, 63 N.J. 474, 484, 308 A.2d 649 (1973). Because "[t]he grant of authority to an administrative agency is to be liberally construed to enable the agency to accomplish the Legislature's goals," Gloucester Cty. Welfare Bd. v. State Civil Serv. Comm'n, 93 N.J. 384, 390, 461 A.2d 575 (1983), we defer to "[t]he agency's interpretation *1168 ... provided it is not plainly unreasonable." Merin v. Maglaki, 126 N.J. 430, 437, 599 A.2d 1256 (1992). Likewise, when reviewing an administrative agency's factual findings, our function is not to substitute our judgment for that of the agency, particularly when that judgment reflects agency expertise. Flanagan v. Department of Civil Serv., 29 N.J. 1, 12, 148 A.2d 14 (1959); see Close v. Kordulak Bros., 44 N.J. 589, 599, 210 A.2d 753 (1965) (stating that courts should afford due deference "to the agency's expertise where such expertise is a pertinent factor").
The proceedings and decisions in this matter involve rate making by the BPU, "to which the Legislature has delegated its rate-making power, [and which] is vested with broad discretion in the exercise of that authority." In re Public Serv. Coordinated Transp., 5 N.J. 196, 214, 74 A.2d 580 (1950). "[T]he BPU's authority over utilities, like that of regulatory agencies generally, extends beyond powers expressly granted by statute to include incidental powers that the agency needs to fulfill its statutory mandate." In re Alleged Violations of Law by Valley Rd. Sewerage Co., 154 N.J. 224, 235, 712 A.2d 653 (1998); see In re Elizabethtown Water Co., 107 N.J. 440, 449-50, 527 A.2d 354 (1987) ("The Legislature has endowed the BPU with broad power to regulate public utilities .... [and] considerable discretion in exercising those powers."). We have long recognized that
[a]dministrative agencies possess the ability to be flexible and responsive to changing conditions. See Heir v. Degnan, 82 N.J. 109, 121, 411 A.2d 194 (1980). This flexibility includes the ability to select those procedures most appropriate to enable the agency to implement legislative policy. See N.J.S.A. 52:14F-7(a) (Supp.1981). Therefore, agencies sometimes develop hybrid proceedings possessing characteristics of both adjudication and rulemaking. See Cunningham, supra, 69 N.J. at 21, 350 A.2d 58 (public utility ratemaking procedures, although quasi-legislative in origin, are conducted like quasi-judicial proceedings); N.J.A.C. 1:1-1.6(a)(3). In fact, courts and commentators have encouraged hybrid agency proceedings as a way of producing more reasoned agency decisions, especially in complex and controversial policy areas. See, e.g., International Harvester Co. v. Ruckelshaus, 478 F.2d 615, 649 (D.C.Cir.1973); id. at 651-652 (Bazelon, C. J., concurring); Bazelon, "Coping with Technology Through the Legal Process," 62 Cornell L.Rev. 817, 824-826 (1977); Stewart, "Vermont Yankee and the Evolution of Administrative Procedure," 91 Harv. L.Rev. 1805, 1812-1814 (1978).
[Texter v. Department of Human Serv., 88 N.J. 376, 385, 443 A.2d 178 (1982).]
Accordingly, upon the exercise of its broad authority and the conduct of appropriate proceedings, "the Board's rulings are entitled to presumptive validity and will not be disturbed unless we find a lack of `reasonable support in the evidence.'" In re Jersey Cent. Power & Light Co., 85 N.J. 520, 527, 428 A.2d 498 (1981) (quoting In re New Jersey Power & Light Co., 9 N.J. 498, 509, 89 A.2d 26 (1952)); see also N.J.S.A. 48:2-46 (stating that courts may set aside BPU's order, in whole or in part, only "when it clearly appears that there was no evidence before the [BPU] to support the same reasonably or that the same was without the jurisdiction of the [BPU]").
In this case, beginning as early as 1995, the BPU held numerous public hearings, solicited comments from the public and interested parties and facilitated negotiation sessions between and among those *1169 parties. Following the issuance of the Final Report in 1997, the BPU and an Administrative Law Judge ("Administrative Law Judge" or "ALJ") conducted trial-type proceedings, receiving testimony and evidence on PSE & G's unbundling, stranded cost and corporate restructuring filings. The BPU also retained an independent auditor to audit those filings and to assist in calculating PSE & G's stranded costs. An extensive record, consisting of a continuum of testimony, evidence, reports, findings and proposals received in contemplation of and subsequent to the enactment of EDECA, supports the BPU's Final Order and BSCRO.
The BPU was required to balance complex and competing interests and did so. The record demonstrates that the Final Order and BSCRO represent the culmination of years of agency review, including the negotiations and agreements reached between PSE & G and seven other interveners. We note that as a part of the discussions, PSE & G agreed to absorb a $250 million reduction in the amount of its unsecuritized stranded costs to the benefit of ratepayers. Under those circumstances, substituting our judgment for that of the agency would be unwarranted unless we were firmly convinced, and we are not, that the agency had abused its discretionary powers. We decline, also, to reject specific elements of the BPU's decision because we find that each element is separately sustainable and because we accept the agency's representation that the Final Order and BSCRO function as an integrated whole in which the parts are related and interdependent.

III

A
Our dissenting colleague, however, believes that the "statute is crystal clear" in requiring that the five percent transition rate reduction is to be measured from 1997 rates. Post at 1178, 167 N.J. at 401. That reduction spans the initial thirty-six months when retail choice is to be phased in under EDECA. See N.J.S.A. 48:3-52(d). The dissent contends that the BPU ignored clear statutory language and its own public positions when the agency ordered the five percent reduction from 1999 rates, which include a 3.9% rate increase approved in April 1998. Post at 1177-78, 167 N.J. at 400-01.
N.J.S.A. 48:3-52(d) provides:
d. (1) During a term to be fixed by the board, each electric public utility shall reduce its aggregate level of rates for each customer class, including any surcharges assessed pursuant to this act, by a percentage to be approved by the board, which shall be at least 10 percent relative to the aggregate level of bundled rates in effect as of April 30, 1997, subject to the provisions of paragraph (2) of this subsection.
(2) The board may set a term for an electric public utility to phase in a rate reduction of ten percent or more during the first 36 months after the starting date for the implementation of retail choice as provided in subsection a. of section 5 of this act; provided, however, that, on the starting date for the implementation of retail choice as provided in subsection a. of section 5 of this act, each electric public utility shall reduce its aggregate level of rates for each customer class, including any surcharges assessed pursuant to this act, by no less than five percent.

[(Emphasis added).]
Subsection (d)(1) mandates that each electric utility shall reduce its aggregate level of rates for each customer class by no less than ten percent "relative to the aggregate *1170 level of bundled rates in effect as of April 30, 1997." Subsection (d)(2) provides that the reduction shall be phased in over a period of three years, with an initial reduction of at least five percent. By its terms, subsection (d)(1) deals with the overall ten percent rate reduction to be achieved as measured against the rates in effect on April 30, 1997. Absent from the text of subsection (d)(2), however, is any mention of a benchmark time period from which the five percent reduction is to be measured.
Contrary to the dissent, we conclude that the drafters intentionally left out of subsection (d)(2) a measuring date for the initial rate reduction in order to allow the BPU to exercise its discretion when phasing in the entire ten percent required. Indeed, the plain language of subsection (d)(2) states that the BPU may "set a term for an electric public utility to phase in a rate reduction." N.J.S.A. 48:3-52(d)(2). Even the Ratepayer Advocate's March 29, 1999 proposed stipulation of settlement states that the initial five percent reduction should be measured from current 1999 rates:
The Better Choice Settlement Proposal, consistent with the requirements of the Energy Competition Act, would require PSE & G's [sic] to reduce its overall rates according to the following schedule (reductions are cumulative):
August 1, 1999-5% reduction from current rates;....
[Ratepayer Advocate's Settlement Proposal at 10.]
Although the Ratepayer Advocate's settlement proposal was not accepted, we assume the 1999 benchmark would not have been suggested by the Ratepayer Advocate if she believed that date to be in derogation of the statute.
We observe as well that one of the critical objectives of EDECA is to implement rate reductions without impairing the financial integrity of the utilities. N.J.S.A. 48:3-50(c)(4). The BPU's approach, which begins with an initial reduction of five percent from 1999 rates and gradually introduces the full reduction over three years, is consistent with this goal. See Fiore v. Consolidated Freightways, 140 N.J. 452, 466, 659 A.2d 436 (1995) ("Our task is to harmonize the individual sections and read the statute in the way that is most consistent with the overall legislative intent."). We therefore hold that the Agency's approach is a plausible and "a permissible interpretation of the legislation, [well] within the discretion of the agency."[2]In re Schedule of Rates for Barnert Mem'l Hosp., 92 N.J. 31, 42, 455 A.2d 469 (1983).

B
Our dissenting colleague also joins in the petitioners' objection to PSE & G's accelerated amortization of its excess depreciation reserve fund and use of those amortization amounts to partially fund the utility's rate reductions and stranded costs *1171 recovery. Post at 1178-79, 167 N.J. at 401-02. The excess-depreciation reserve fund resulted from changing the useful life of the company's distribution plant investments from twenty-eight years to forty-five years. By lengthening the useful life of its assets, a substantial excess depreciation reserve accrued on PSE & G's balance sheet. The BPU approved PSE & G's amortization of that $568.7 million excess depreciation reserve over three years and seven months, beginning January 1, 2000 and ending July 31, 2003, by establishing amortization amounts of $125 million in 2000, $125 million in 2001, $135 million in 2002 and $183.7 million in 2003. Those amounts are to be recorded in the appropriate year as credits against expenses, thereby increasing PSE & G's ability during the transition period to absorb the financial impact of the rate reductions mandated by EDECA. This scheme, contends the dissent, "might very well violate the letter and spirit of EDECA, create a windfall for PSE & G, and undermine public confidence in the fairness of the Final Order." Post at 1181, 167 N.J. at 405-06.
We agree with the Appellate Division that "there is nothing in [EDECA] to prohibit deferred accounting." In re PSE & G, supra, 330 N.J.Super. at 114, 748 A.2d 1161. Although there are statutory provisions in relation to the required level of rate reductions, supra at 1169-70, 167 N.J. at 387-88, and as to the "manner in which to apply the rate reductions," N.J.S.A. 48:3-52(f), the Legislature has not specified the funding source for those reductions. However, as also pointed out by the Appellate Division, In re PSE & G, supra, 330 N.J.Super. at 114, 748 A.2d 1161, N.J.S.A. 48:3-57(b)(3) provides that
[t]he board may devise an alternative accounting or cost recovery process that permits an electric public utility to purchase power from a related competitive business segment of its public utility holding company, or otherwise, to provide basic generation service to its customers during the period that the electric public utility is providing for sustainable rate reductions ..., if the board determines that such process is necessary to mitigate the impacts of market price fluctuations and to sustain such rate reductions.

[N.J.S.A. 48:3-57(b)(3).]
Section 57(b)(3) is clear: the BPU has the power to authorize "alternative accounting" over the period when "sustainable rate reductions" are required. Most interesting, the language of the provision tells us that "sustainable" is being used, not in the temporal sense, but, rather, to mean "supportable," i.e., that alternative methods may be needed to adjust for market pricing "and to sustain [(support)] such rate reductions" during the three years reductions are in place. Id. In effect, the practical result of allowing PSE & G to amortize its excess depreciation reserve is to soften the financial blow of the required reductions during the early phase-in period of deregulation.
Although the dissent and petitioners have their own view of how best to achieve "sustainable rate reductions," we are convinced that neither the law nor the facts in the record below permit the Court to second-guess the BPU's judgment. We hold that the BPU acted well within its discretion in allowing PSE & G to accelerate the amortization of its excess depreciation reserve.

C
Finally, our dissenting colleague contends that the record does not "support the BPU's generation asset valuation and stranded cost determination." Post at *1172 1181, 167 N.J. at 406. On that basis, and because he believes that the BPU failed to hold "an adequate evidentiary hearing," the dissent would remand for a further hearing on that determination. Id.
The EDECA scheme has been succinctly described by the Appellate Division:
Although [EDECA] does not mandate total divestiture, it allows utilities to functionally separate their generation assets and transfer them to an affiliate. N.J.S.A. 48:3-59. The utilities are permitted to recover stranded costs, the generation plant costs which the utility is at risk of losing when the supply market is opened to competition through a limited-duration (up to eight years) nonbypassable market transition charge (MTC). N.J.S.A. 48:3-61(a).... They are also permitted to impose a nonbypassable transition bond charge (TBC) (for up to fifteen years) in order to recover stranded costs. N.J.S.A. 48:3-62(a).
[In re PSE & G, supra, 330 N.J.Super. at 90, 748 A.2d 1161.]
The quantification of stranded costs therefore is directly affected by the market value of any generating assets transferred, in this case, to an affiliate. N.J.S.A. 48:3-61(e). Under N.J.S.A. 48:3-55(d), "the transfer of electric public utility assets... to a related competitive business segment of that electric public utility ... shall be recorded at full value as determined by the Board." The statute requires maximization of the "market value of the generating asset," N.J.S.A. 48:3-61(f), in order to reduce the stranded costs to be recovered from ratepayers. Id. Once the BPU determines the total amount of recoverable stranded costs, it may authorize the securitization of those costs by the issuance of transition bonds and the imposition of a transition bond charge so that the utility can recover those costs. N.J.S.A. 48:3-62(a); N.J.S.A. 48:3-64(a). Ultimately, it is the question of the market value of the generating assets that concerns the dissent, precisely because of the impact of that value on ratepayer charges.
Following hearings before an Administrative Law Judge, the BPU commissioned an independent auditor to assist in the calculation of PSE & G's stranded costs. When settlement negotiations between the parties failed, PSE & G and seven other interveners[3] submitted a proposed stipulation of settlement to which the petitioners responded by submitting their own proposal for settlement. After considering those competing proposals and the parties' respective comments, on April 21, 1999 the BPU found PSE & G's stipulation more financially prudent and consistent with EDECA's requirements. In its Final Order, the BPU adopted the auditor's mid-range calculation of stranded costs, and then adjusted the amount downward to account for nitrogen oxide and sulfur dioxide emission credits.
We are satisfied that the BPU's Final Order reflects findings that are supported by the record and are consistent with EDECA. Contrary to the dissent's assertion that the BPU should have considered "market-based valuations," post at 1186, 167 N.J. at 413-14, the Appellate Division again correctly observes that EDECA "does not specify what methodology should be used in determining the value of assets to be transferred to an affiliate." In re PSE & G, supra, 330 *1173 N.J.Super. at 124, 748 A.2d 1161. During the administrative proceedings below, the ALJ used a "market price forecast" or "administrative" methodology to examine asset value. At the time, PSE & G had not proposed a transfer of its generation facilities to an affiliate and so the ALJ's income projection approach was developed "in the context of determining the amount of stranded costs PSE & G could recover for each of its generating plants." Id. In any case, the ALJ's methodology became the basis for the independent auditor's calculations. The auditor's report, in turn, contained three stranded costs calculations based on different inflation estimates: low, middle and high. The BPU accepted "as reasonable" the auditor's mid-range calculation.
The dissent, however, argues that the BPU's choice constitutes an utter failure "to provide ... any explanation for" the agency's adoption of the auditor's mid-range stranded costs calculation. Post at 1186, 167 N.J. at 413-14. But common sense tells us that by selecting the mid-range figure, the BPU was simply applying its expertise to reject more extreme estimates in the face of uncertainty regarding inflation rates. In sum, the record demonstrates that the BPU's asset valuation is grounded in the ALJ's findings, albeit in a marginally different context, the independent auditor's report, and PSE & G's proposed stipulation of settlement. Further, the BPU's stranded costs determination involves complex valuation formulas and accounting concepts, which are exactly the type of decisions that our precedents instruct are best left to the agency's expertise. In re Kessler Mem'l Hosp., 78 N.J. 564, 576-77, 397 A.2d 656 (1979) (Handler, J., concurring) (stating that rate-setting decisions by the BPU require "judicial deference to the discretion exercised by the agency experts"). We are therefore convinced that "there was substantial evidence in the record to support [the BPU's] findings on valuation." In re PSE & G, supra, 330 N.J.Super. at 128, 748 A.2d 1161.
On the issue whether a remand is necessary, we are also convinced that the process undertaken by the BPU afforded ample opportunity to the parties to comment and present their cases. We disagree with our colleague's assertion that the BPU should have held a hearing "with respect to the [immediate] transfer of generation-related assets to [PSE & G's affiliate] GENCO", post at 1186, 167 N.J. at 413-14, because that transfer was anticipated as a possibility by the parties. As the Appellate Division noted, there was "testimony on alternatives: for example, a witness on behalf of [Independent Energy Producers of NJ] faulted PSE & G for separation of its generating facilities after, rather than at the beginning of, the transition period and a witness on behalf of the [Ratepayer Advocate] testified that complete divestiture was the best option." In re PSE & G, supra, 330 N.J.Super. at 112, 748 A.2d 1161.
But even if we accept the dissent's contention that the BPU should have reopened the proceedings and permitted further testimony and cross-examination, post at 1186, 167 N.J. at 413-14, a reviewing court may set aside an order of the BPU only "when it clearly appears that there was no evidence before the board to support the same reasonably...." N.J.S.A. 48:2-46. The Public Utilities Act also specifically prohibits courts from reversing a BPU decision for a mere "irregularity or informality in the proceedings of the board unless the irregularity or informality tends to defeat or impair the substantial right or interest of the appellant." Id.
*1174 The BPU's valuation of PSE & G's generation facilities and its stranded costs determination were based on years of fact-finding and extensive quasi-judicial and quasi-legislative proceedings. The parties participated fully and vigorously at all stages. We find no procedural infirmity that would compel us to remand at this juncture for additional hearings on those matters.

D
We note the dissent's concern that we abdicate our appellate responsibilities when we review the BPU's decision as an integrated whole in which the component parts are both interrelated and interdependent. Post at 1176, 167 N.J. at 397-98. That approach, the dissent fears, undercuts the function of the Court and inappropriately insulates the Final Order from review. Id.
The dissent's fears are unfounded. Our review suggests only that the separate aspects of the BPU decision should not be separately invalidated but, rather, the whole should fall if some component is infirm. However, we need not reach that question, because we do not find any single component of the Final Order to be infirm. Moreover, the BPU's understanding of its decision as an indivisible unit appropriately serves to inform our review as we examine both the discrete decisions and consider their relationship to the whole.

IV
We are not unmindful of the impacts of rate deregulation in California. The story of higher energy costs and energy shortages have appeared in newspaper headlines here in New Jersey, and our citizens are aware of the blackouts in California and their economic repercussions. Jennifer Coleman, Calif. faces more summer power woes, Star-Ledger, Apr. 22, 2001, at 43; H. Josef Herbert, Summer forecast: Blackouts in Calif. and higher gas prices, Star-Ledger, Mar. 16, 2001, at 21; David Ress, `New Jersey's not California,' BPU chief assures senators, Star-Ledger, Feb. 8, 2001, at 26; Nigel Hunt, California's biggest utility in trouble, Star-Ledger, Jan. 11, 2001, at 6. Indeed, the cost and availability of energy have become a national issue. But we do not here rule on the wisdom of EDECA. Under our system of government, it is the other two branchesthe legislative and the executivethat are entrusted with that authority and they have chosen their course. We find that the BPU has properly exercised its discretion under EDECA in respect of PSE & G's filings.
The judgment of the Appellate Division is affirmed. The filing of this opinion constitutes entry of the Court's judgment.
STEIN, J., concurring in part and dissenting in part.
This complex appeal primarily concerns the validity of the final decision and Order, dated August 24, 1999 (Final Order), issued by the Board of Public Utilities (BPU), in respect of filings by Public Service Electric and Gas Company (PSE & G) that relate to rate unbundling, stranded costs and corporate restructuring. Also at issue is the validity of the BPU's September 17, 1999 Bondable Stranded Cost Rate Order (BSCRO), issued in response to PSE & G's petition to securitize its recovery-eligible stranded costs. The Final Order was issued pursuant to, and was intended to implement, the provisions of the Electric Discount and Energy Competition Act (EDECA), N.J.S.A. 48:3-49 to -98. That statute, which took effect in February 1999, was enacted to authorize the BPU, to (1) "permit competition in the electric generation and gas marketplace" and "thereby reduce the aggregate energy *1175 rates currently paid by all New Jersey consumers;" (2)"[p]rovide for regulation of new market entrants in the areas of safe, adequate and proper service and customer protection;" (3) "[r]elieve electric public utilities from traditional utility rate regulation" for services provided in a competitive market; (4) provide electric public utilities "the opportunity to recover above-market power generation and supply costs ... associated with the restructuring of the electric industry;" and (5) "[p]rovide [the BPU] with ongoing oversight and regulatory authority to monitor and review composition of the electric generation and retail power supply marketplace in New Jersey...." N.J.S.A. 48:3-50(c).
The PSE & G filings that were the subject of the Final Order were made in response to a report released by the BPU on April 30, 1997 entitled "Restructuring the Electric Power Industry in New Jersey: Findings and Recommendations." (Final Report). The Final Report recommended, in part, that by July 2000 all of the State's retail customers should be able to select their electric power supplier and that rate reductions of from five to ten percent should be implemented while retail competition was being phased in. The BPU's order adopting the Final Report mandated that the existing four utility monopolies, PSE & G, Jersey Central Power & Light Company (GPU), Rockland Electric Company (RECO), and Atlantic Electric Company (Atlantic), submit three filings to the BPU: a rate unbundling petition, a stranded cost petition, and a restructuring plan.
The rate unbundling petition was to address the manner in which the single, per-kilowatt-hour charge that appears on a customer's bill would be separated into its component parts, including generation, transmission and distribution-an essential step because the Final Report contemplated that only the generation segment of the bill would be subject to competition. The stranded cost filings related to the utilities' right to recover after deregulation some portion of their overmarket (stranded) costs that would have been recovered in rate cases if they had continued as regulated monopolies. The issues in the stranded cost filings focused on entitlement to stranded cost recovery and quantification of stranded costs. The restructuring filings related to the reorganization of the four utilities to promote competition in electricity generation, focusing on the utilities' divestiture of generating assets and, if such assets were transferred to unregulated affiliates as in PSE & G's case, the valuation of such transferred assets.
Thus, the BPU's Final Order, applicable only to PSE & G as the first of the State's utility monopolies whose filing under EDECA has received final agency review, constitutes an agency determination of monumental significance in the process of restructuring and deregulating the sale of electric power in this State. An appeal from the Final Order was taken by the Division of the Ratepayer Advocate (RA), New Jersey Business Users (NJBUS), a group of large industrial and commercial customers, and Co-Steel Raritan, one of PSE & G's largest commercial customers. On appeal, the Appellate Division, in a thoughtful and comprehensive published opinion, affirmed the Final Order in all respects. In re PSE & G Co.'s Rate Unbundling, Stranded Costs and Restructuring Filings, 330 N.J.Super. 65, 748 A.2d 1161 (2000). We granted the petitions for certification filed by the RA and NJBUS, and granted in part the petition for certification filed by Co-Steel limited to the issues concerning rate reduction. 165 N.J. 489, 758 A.2d 648 (2000).
At oral argument, and in supplemental post-argument briefs filed by the parties at *1176 the Court's request, the BPU, PSE & G, and various intervenors that supported the Final Order, argued that the Court should reject various discrete challenges to the Final Order advanced by petitioners, not only because those challenges were unmeritorious but, more importantly, because the Final Order constituted the BPU's comprehensive and indivisible response to PSE & G's filings, and because invalidation of any discrete aspects of the Final Order would unbalance the BPU's carefully and comprehensively integrated determination, require offsetting modifications to the Final Order, delay rate reductions, and do harm to the public interest.
The Court, by order filed December 6, 2000, has affirmed the judgment of the Appellate Division. I write separately because in my view three aspects of the Final Order are seriously flawed. Moreover, I would reject the contention of respondents and some intervenors that reversal of discrete aspects of the Final Order is unsound because the Final Order must stand or fall as an integrated and indivisible unit. That approach would effectively insulate the BPU's Final Order from judicial review and partial invalidation on the premise that, even if aspects of the Final Order are contrary to law, the public interest is better served by preserving an integrated disposition with unlawful components than it would be by invalidating the unlawful components and requiring modification of the Final Order in conformity with applicable legal principles. The pragmatism that inspires the argument of the proponents of the Final Order must, in my view, yield to the constitutional authorization of judicial review of administrative agency determinations. N.J. Const., art. IV, § 5, ¶ 4. See Fischer v. Township of Bedminster, 5 N.J. 534, 538-40, 76 A.2d 673 (1950). Clearly, our constitutional obligation of judicial review would be disserved and frustrated if we were to ignore illegal and invalid components of the Final Order for the purpose of preserving the claimed practical benefits of an integrated Final Order, notwithstanding its flaws.

I
The first issue on which I part company with the Court concerns the calculation of the statutorily-mandated rate reduction during the first thirty-six months following the starting date for the implementation of retail choice pursuant to N.J.S.A. 48:3-53(a). EDECA mandates that each electric utility shall reduce its aggregate level of rates for each customer class by no less than five percent during such three-year period. The BPU's Final Order permitted PSE & G to calculate that rate reduction from its 1999 rates, which included a 3.9% rate increase approved in April 1998. Petitioner's contend that the five percent rate reduction must be calculated from rates in effect on April 30, 1997, which would require an initial rate reduction of 8.9% from 1999 rates. NJBUS and the RA assert that the difference between their calculation of the initial rate reduction and the smaller rate reduction approved by the BPU's Final Order is between $250 and $300 million, but PSE & G contends that the difference involves approximately $160 million.
The analysis begins with the language of EDECA:
d. (1) During a term to be fixed by the board, each electric public utility shall reduce its aggregate level of rates for each customer class, including any surcharges assessed pursuant to this act, by a percentage to be approved by the board, which shall be at least 10 percent relative to the aggregate level of bundled rates in effect as of April 30, 1997, subject to the provisions of paragraph (2) of this subsection.

*1177 (2) The board may set a term for an electric public utility to phase in a rate reduction of ten percent or more during the first 36 months after the starting date for the implementation of retail choice as provided in subsection a. of section 5 of this act; provided, however, that, on the starting date for the implementation of retail choice as provided in subsection a. of section 5 of this act, each electric public utility shall reduce its aggregate level of rates for each customer class, including any surcharges assessed pursuant to this act, by no less than five percent.

[N.J.S.A. 48:3-52(d) (emphasis added).]
The Board's Final Order acknowledges that because the statutory starting date for the implementation of retail choice is not later than August 1, 1999, see N.J.S.A. 48:3-53(a), EDECA mandates that "each electric public utility shall reduce its aggregate level of rates by at least 10% relative to the level of bundled rates in effect as of April 30, 1997." Final Report at 92. Because PSE & G had received in 1998 a 3.9% rate increase, the Board acknowledged that EDECA mandated that PSE & G reduce its current rates by 13.9% as of August 1, 2002. The BPU's Final Order noted further that the statute also mandated a five percent rate reduction commencing August 1, 1999, but the BPU's Order fails to state specifically whether under EDECA that reduction, like the ten percent reduction, must also be from the rate in effect on April 30, 1997, or whether the five percent reduction can be from current rates, which include the 1998 3.9% increase. Rather the BPU sidesteps the issue by making a finding that the rate reductions proposed in the Stipulation offered by PSE & G are adequate and, as that Stipulation reveals, the proposed five percent reduction is from current rates. In my view both the statute and its legislative history clearly indicate that the five percent reduction should be calculated from the rates in effect on April 30, 1997.
In view of the BPU's lead role in the drafting of EDECA, for the Board to fail to justify its strained construction of the statute it helped to draft, and resort instead to reliance on PSE & G's stipulation, simply strains credulity. Nevertheless, the Appellate Division sustained the BPU's determination, noting that "[c]ommon sense leads to the conclusion that the BPU's schedule of rate reductions is a reasonable interpretation of the statute." In re PSE & G, supra, 330 N.J.Super. at 103, 748 A.2d 1161. That court also noted that under the BPU's Order the full 13.9% reduction must be in place by August 1, 2002, whereas the RA's reading of the statute would mandate an 8.9% reduction by August 1, 1999, with the additional five percent reduction implemented over the next three years.
The RA and NJBUS argue persuasively that the BPU ignores overwhelming evidence demonstrating that its approval of PSE & G's formulation of the initial five percent rate reduction is contradicted by the BPU's own public positions on the issue. For example, the BPU's Final Report, issued April 30, 1997, contained this statement about the calculation of rate reductions:
However, we believe that the introduction of a near term rate reduction on the order of 5-10%, concurrent with the unbundling of rates and the introduction of retail customer choice in conjunction with securitization, is an appropriate goal.
In response to concerns that these targeted rate reductions may be eroded by subsequent upward rate adjustments between now and the date of retail competition, *1178 we emphasize that the targeted rate reductions must be in comparison to the current level of rates as of the date of his report.

[(Emphasis added).]
Moreover, when the BPU approved in April 1998 PSE & G's 3.9% Demand Side Management (DSM) increase, its own Order approving that increase confirmed that the increase would not erode rate reductions required by EDECA. That Order stated:
The Board notes its intent that regardless of the ultimate allocation of costs to the various rate components, rate reductions will be calculated based on a comparison of the aggregate level of bundled rates in effect in April 1997 to the new aggregate level of rates.
[I/M/O the Motion of Public Service Electric and Gas Company to Increase the Level of the Electric Demand Side Adjustment Factor, BPU Docket No. ER XX-XXXXXX, (April 1, 1998) at 12-13.]
I also note that when the RA appealed to the Appellate Division the BPU's Order granting PSE & G its 3.9% rate increase, the BPU's Appellate Division brief asserted on page 17: "The Board's approval of this single item rate increase is not to affect its requirement that, as part of restructuring, PSE & G's 5% to 10% rate reduction will be in comparison to its April 30, 1997 rates, that is, prior to the demand side adjustment factor increase."
I also believe the statute is crystal clear. Section d(1) of N.J.S.A. 48:3-52 requires a ten percent rate reduction by August 1, 2002 from rates as of April 30, 1997. Section d(2) modifies d(1) to permit the ten percent rate reduction to be phased in over three years from August 1, 1999, provided that a five percent rate reduction is implemented immediately. That reading of the statute is confirmed by the Assembly and State Legislative Fiscal Estimate that states: "These estimates assume that the rate discount is applied to the total electric rate using April of 1997 as the basic date."
PSE & G contends that if the Court were to order a retroactive rate adjustment, the BPU would be obligated to consider reducing the shopping credit and restructuring PSE & G's stranded cost recovery. I find no support in EDECA for the contention that shopping credits, stranded cost recovery, and the statutorily mandated rate reduction necessarily are interdependent. Moreover, by urging the BPU to adopt Stipulation I that provided that the initial five percent rate reduction was from current rates, PSE & G clearly understood and assumed the risk that a reviewing court would reject that interpretation of the statute.
Because the BPU's Final Order unlawfully allows PSE & G to implement the initial mandatory five percent reduction from current rates, rather than from the rates in effect on April 30, 1997, I would remand the matter to the BPU to order a retroactive adjustment of PSE & G's initial rate reduction to conform to the clear requirements of EDECA.

II
I also disagree strongly with the Court's affirmance of the Appellate Division's determination, In re PSE & G, supra, 330 N.J.Super. at 138, 748 A.2d 1161, that the BPU's approval in the Final Order of the accelerated amortization over forty-three months of PSE & G's excess depreciation reserve fund "was within its discretion and did not violate the Act."
PSE & G's $568.7 million-dollar excess-depreciation reserve fund resulted directly from PSE & G's proposal to the BPU, at the outset of the stranded cost proceedings, *1179 to change the average life used to establish depreciation rates for PSE & G's distribution plant investment from twenty-eight years to forty-five years. That proposal was supported by the testimony of Robert C. Krueger, Jr., Director-Tax Services of PSE & G, who justified the change solely on the basis that a forty-five year life for the distribution plant was consistent with data presented in PSE & G's last depreciation rate proceeding. Mr. Krueger explained that by lengthening the useful life of PSE & G's distribution plant assets from twenty-eight to forty-five years, a substantial excess depreciation reserve would accrue on PSE & G's balance sheet to account for the fact that its distribution plant assets had been depreciated too quickly (over twenty-eight rather than forty-five years). In his testimony Mr. Krueger estimated the amount of that reserve to be $433 million dollars as of December 31, 1996.
Mr. Krueger also testified that
[t]here are two ways to address this over accrual. The first is to utilize it in the calculation of the new depreciation rate which would reduce the rate for the remaining [useful life of the plant assets]. The second would be to amortize it over a shorter period of time maintaining the depreciation rate at a higher level.
Krueger proposed to the BPU that the excess depreciation reserve be amortized over seven years.
In its Final Order, however, the BPU approved the proposal in PSE & G's stipulation to amortize the $568.7 million excess depreciation reserve over three years and seven months, beginning January 1, 2000 and ending July 31, 2003. The BPU established amortization amounts of $125 million dollars in years 2000 and 2001, $135 million in 2002, and $183.7 in 2003, and acknowledged in the Final Order that those amortization amounts were to be used by PSE & G to partially fund its rate reductions and stranded cost recovery. PSE & G acknowledges that the amortization amounts would be recorded by PSE & G as credits against expenses (cost-reductions), resulting in increased income available to PSE & G during the transition period to absorb a substantial portion of the impact of the rate reductions mandated by EDECA. In fact, NJBUS asserts that of the $1.294 billion rate reduction ordered by the BPU, approximately forty-four percent would be funded by the excess-depreciation reserve fund created by excess depreciation charges previously imposed on ratepayers. PSE & G responds that, giving effect to related tax liabilities and other factors, the actual amount of the depreciation reserve available for rate reductions or stranded cost recovery is $380 million.
Petitioners contend that the overly-generous amortization of PSE & G's excess depreciation reserve has the effect of creating an available source of funds, generated by excess depreciation charges to ratepayers over prior years, that PSE & G can use to finance the rate reductions that the Legislature contemplated would result in a reduction of the company's profits. Petitioners rely on section 4 of EDECA, N.J.S.A. 48:3-52(f), that provides:
f. The board shall determine, consistent with the provisions of this act, the manner in which to apply the rate reductions established pursuant to subsections d. and e. of this section among some or all of the unbundled rate components, including the distribution and transmission charges and market transition charges, in order to provide for a sustainable aggregate rate reduction for customers and to encourage a competitive retail supply marketplace.
*1180 Petitioners argue that that subsection of EDECA specifically contemplates not only that the rate reduction shall be allocated among PSE & G's distribution, transmission and market transition changes, but that the Act's reference to "a sustainable aggregate rate reduction for customers" clearly is inconsistent with the BPU's decision to allow PSE & G to fund a substantial portion of the statutory rate reduction with a one-time, non-recurring excess depreciation reserve fund.
Moreover, petitioners note that pursuant to sections 13 and 14 of EDECA, N.J.S.A. 48:3-61 and -62, electric utilities are authorized to recover that portion of their stranded costs not securitized by the issuance of transition bonds by imposing a market transition charge on all customers for a term not to exceed eight years. However, petitioners rely specifically on N.J.S.A. 48:3-61(h) which provides that "the board shall not determine a level for the market transition charge for recovery of a utility's eligible stranded costs ... which prevents the achievement of the rate reductions required pursuant to section 4 of this act...." According to petitioner, that provision of EDECA contemplates that a utility unable to fund the required rate reductions by reducing distribution or transmission charges must fund the rate reductions by reducing the market transition charge, subject to the statute's qualifying language that the rate reductions neither impair the utility's "financial integrity" or its "access to the capital markets." N.J.S.A. 48:3-61(h). In short, petitioner's argue that the BPU's authorization of an unusually brief amortization period for the excess depreciation reserve fund was a windfall that permitted PSE & G to achieve the required rate reductions without reducing either its distribution and transmission charges or its market transition charge.
At oral argument, counsel for PSE & G acknowledged, as did PSE & G's Tax Manager in testimony before the BPU, that the BPU could have required PSE & G to reduce future depreciation charges to ratepayers by amortizing the excess depreciation reserve fund over the remaining useful life of the relevant assets. We requested supplemental briefing on the manner in which, absent restructuring, the reserve fund would have been amortized in accordance with generally accepted accounting principles. Neither PSE & G's nor the BPU's response was reassuring or informative. PSE & G cited generally to the Statement of Financial Accounting Standard No. 71 for the proposition that regulatory agencies have the authority to amortize so-called regulatory liabilities on an accelerated basis, but without providing any relevant or persuasive support for the BPU's decision to amortize the $568.7 excess depreciation reserve fund over forty-three months. The BPU similarly cited to the Statement of Financial Accounting Standards No. 71, and specifically cited In re the Petition of Jersey Ctr. Power and Light Co., 85 N.J. 520, 528, 428 A.2d 498 (1981) as authority for the accelerated amortization period that it sanctioned. That case clearly is inapposite, involving as it did the BPU's emergency acceleration of the amortization of Jersey Central Power and Light Company's (JCP & L) deferred energy balance to produce additional revenues that precisely equaled the loss in revenue caused by the removal of Three Mile Island Unit 1 from JCP & L's rate base, our Court noting the BPU's concern about the utility's possible insolvency. Id. at 527-28, 428 A.2d 498. The BPU's brief also acknowledged that an alternative disposition would have been to amortize the reserve fund over the useful life of the plant assets.
NJBUS agreed with the statement of PSE & G's counsel at oral argument that *1181 the excess depreciation reserve fund should have been amortized over the useful life of the distribution plant assets to reduce future depreciation charges. The RA concurred, stating that, absent restructuring, the excess depreciation reserve fund should have been returned to customers through lower depreciation rates over the remaining life of the plant assets.
Based on the respective representations of PSE & G's Tax Manager and its counsel to the BPU and to this Court, and the insubstantial support for the BPU's accelerated amortization schedule provided by the supplemental briefing we requested, I have no confidence in the validity of the accelerated amortization ordered by the BPU nor in its authority to order it. The Final Order itself is conclusory, and reflects no insight or appreciation by the BPU that to permit PSE & G to amortize this excess depreciation reserve fund over forty-three monthsalmost twice as fast as PSE & G requestedmight very well violate the letter and spirit of EDECA, create a windfall for PSE & G, and undermine public confidence in the fairness of the Final Order. For those reasons, I would reverse that portion of the Appellate Division judgment that approved the BPU's accelerated amortization of the excess depreciation reserve fund and remand that issue to the BPU for reconsideration on the record below.

III
Finally, I fully agree with petitioners' contentions that the lack of an adequate evidentiary hearing concerning the value attributable to PSE & G's stranded assets denied due process to petitioners, and that the evidence in the record was insufficient to support the BPU's generation asset valuation and stranded cost determination.
The RA characterizes the economic impact of the BPU's arbitrary stranded cost determination and generation asset valuation as the single most significant issue in this appeal. EDECA generally defines stranded costs as "the amount by which the net cost of an electric public utility's electric generating assets ... exceeds the market value of those assets...." N.J.S.A. 48:3-51. The statute requires the BPU to determine the amount of stranded costs eligible to be recovered by a utility, N.J.S.A. 48:3-61(c), and authorize the issuance of transition bonds to securitize up to seventy-five percent of such recoverable stranded costs. N.J.S.A. 48:3-62(c)(1). A transition bond charge may be imposed by the utility on its customers over a fifteen-year amortization period to cover principal and interest charges on such bonds. N.J.S.A. 48:3-62(d)(1). Because the BPU determined PSE & G's stranded costs to be $2.94 billion, with $2.4 billion of such costs approved for securitization, the RA contends that PSE & G's customers will be saddled with an overstated and excessive stranded cost surcharge over the next fifteen years.
The crux of the procedural due process issue derives from the fact that when PSE & G, in July 1997, submitted a filing containing its rate unbundling, stranded costs and restructuring proposals, its filing contemplated that PSE & G would remain in the electric generation business during the then proposed seven-year transition period, and then transfer its generation assets to an affiliate of its holding company at the end of that seven-year period. That restructuring proposal contrasted with those of the other three utility companies that contemplated immediate divestiture of generating assets through sales to unaffiliated entities. Accordingly, the extensive hearings on the unbundling and stranded cost filings before the Office of Administrative Law in February and March 1998, and the similarly extensive hearings before *1182 BPU Commissioner Armenti on the restructuring filing in April and May 1998, as well as the extensive prefiled witness testimony and the parties briefs, all contemplated the retention by PSE & G of its generating assets for a seven-year transition period.
In March of 1999, approximately ten months after the hearings were completed and seven months after the ALJ's initial decision on the rate unbundling and stranded cost filings, PSE & G and seven other parties submitted a proposed stipulation of settlement (Stipulation I) that, for the first time, proposed the immediate transfer of PSE & G's generating facilities to GENCO, an unregulated affiliate of PSE & G. Immediately prior to the filing of Stipulation I, a motion, supported by petitioners, was made to reopen the record in the unbundling and stranded cost proceedings, but the BPU denied the motion.
The BPU's stranded cost determination was a direct result of its finding that the market value of PSE & G's generation assets to be transferred to GENCO was $1.903 billion. EDECA mandates that a utility's transfer of assets to an affiliate must be at "full value," N.J.S.A. 48:3-55(d), defined more precisely by EDECA as "full market value." N.J.S.A. 48:3-61(e). In the stranded cost proceeding before the OAL, the Administrative Law Judge (ALJ) did not determine either the value of PSE & G's generating assets (because at that time PSE & G intended to retain such assets for seven years), or the amount of PSE & G's stranded costs. But based on the evidence in the record, the ALJ in his decision provided an "administrative estimate" concerning the method for fixing the market value of generating assets, which in turn would lead to a determination of stranded costs. That methodology did not rely on comparable sales of generating assets, but rather contemplated a valuation based on the estimated earnings to be derived from those assets. He stated:
Absent divestiture, an administrative determination must be made to arrive at a quantification of stranded costs. The Company's methodology, which was broadly followed by all intervenors in their studies, was premised on the fact that market value can be estimated administratively by utilizing a market price forecast. The forecasted market energy price and capacity price, applied to the forecasted output of particular generating assets, is used to derive a projected market revenue of each facility on an annual basis. Forecasted annual cash expenditures including fuel, operation and maintenance (O & M) expenses, capital additions, taxes, administrative and general expenses and other ancillary costs are then subtracted from the projected annual market revenues. A comparable analysis is performed for each generating facility, as well as for each power purchase agreement with NUG contractors. The net results are discounted back to the present value using a discount rate of 8.42 percent, this value being based upon the Company's 1992 cost of capital, using the Company's capital structure provided in the last base rate case.
Notwithstanding the methodology proposed by the ALJ for calculating stranded costs, the ALJ found it to be "impossible to determine a specific stranded cost amount for the Board's consideration" and recommended that the parties confer on the issue. The parties did confer in September 1998 but could not resolve the issue. The BPU then retained ICF Resources Incorporated (ICF Resources or ICF), an independent consulting firm, to render a report to the BPU recommending a stranded cost valuation. See In re PSE *1183 & G, supra, 330 N.J.Super. at 114-115, 748 A.2d 1161.
Before reviewing the ICF Resources report on which the BPU based its stranded cost evaluation, I note the RA's contention that the BPU's evaluation substantially exceeds all of the stranded cost estimates submitted by parties before the ALJ, including the estimate by the Board's then consultant. The RA's expert estimated PSE & G's generation-related stranded costs at $1.9 billion. Enron Corporation, an active litigant before the ALJ, estimated stranded costs at $2.3 billion. ICF Kaiser[4], a consultant for the BPU during the ALJ proceeding, calculated that its best estimate of PSE & G's generation-related stranded costs to be $2.1 billion, with "moderate mitigation," a figure that the consultant characterized as "less than 54 percent of the PSE & G filed estimate."
The ICF Resources report, requested by the BPU in September 1998, was submitted in early November 1998 and contained three different stranded cost calculations based on different inflation rates: $2.485 billion; $2.949 billion; and $3.310 billion. Shortly after its receipt, the Attorney General's office forwarded that ICF report to all parties "for your information," with the explanation that the calculation of stranded costs in the report represented ICF's "best interpretation and quantification of the ALJ's Initial Decision" but noting that the "quantification does not necessarily represent the position of the BPU staff." No responses to the ICF report were requested by the Attorney General's office or by the BPU, and none were received. Id. at 115-16, 748 A.2d 1161. Significantly, the author of that report never testified in support of the report's findings before the BPU or an ALJ, and was never subject to cross-examination. More than nine months later, in its Final Report, the BPU adopted, without any explanation, ICF's "middle" quantification of stranded costs. The Board's order simply states:
While no consensus was reached among the parties, after the meeting, by letter dated November 18, 1998, the Auditors submitted to the Board a proposed quantification of the ALJ's stranded cost recommendations, reflecting a range of values based on three scenarios, from a low end of $2.485 billion, to a mid-range of $2.949 billion, to a high end of $3.310 billion. We HEREBY ACCEPT as reasonable, with one minor modification discussed below, the Auditors' mid-range quantification of the ALJ's decision with respect to PSE & G's net-of-tax owned generation stranded costs of $2.949 billion and, based on that quantification, HEREBY ADOPT the ALJ's ID [Internal Decision].
The BPU slightly adjusted downward ICF's mid-range figure from $2.949 billion to $2.94 billion, to account for nitrogen oxide and sulfur dioxide emission credits, but without any explanation for its valuation of those credits.
Several of the arguments advanced by the RA and NJBUS persuade me that the BPU's valuation of PSE & G's generation-related stranded costs was procedurally flawed, and that the record should be reopened, as petitioners contend, for introduction of evidence of current valuations of generation-related assets based on actual sales as well as to permit direct-and cross-examination of the author of the ICF report.
The RA observes that EDECA mandates notice and a hearing on the elements *1184 of a utility's restructuring plan. N.J.S.A. 48:3-53(b) provides in part:
The board shall have the authority to require each electric public utility to submit a restructuring filing, with elements deemed necessary by the board, which shall include the mechanisms by which it will comply with the schedule for implementation of retail choice established pursuant to subsection a. of this section and with the other provisions of this act. Such filing shall be reviewed and, after notice and hearing, may be approved, rejected or modified by the board ....

[(Emphasis added).]
Because PSE & G's proposal to transfer its generation-related assets to GENCO was first announced in Stipulation I in March 1999, that crucial aspect of PSE & G's restructuring plan was never the subject of a public hearing, with live testimony, contrary to the mandate of EDECA.
In addition, NJBUS observes that the entire context of the stranded costs valuation proceeding before the ALJ was skewed because the participants then understood that PSE & G intended to retain ownership of its generation-related stranded assets for seven years. As NJBUS notes, EDECA mandates that the BPU periodically review the market value of retained assets, and if necessary reduce market transition charges, to ensure that a utility does not receive reimbursement from customers in excess of actual stranded costs. N.J.S.A. 48:3-61(f) and (g) provide in part:
f. For the purposes of quantifying the magnitude of stranded costs eligible for recovery via the market transition charge, the board shall require or impute all reasonably available measures for the electric public utility to mitigate the quantity of stranded costs, by:
(1) Reducing the cost of power purchase commitments and the on-going capital and operations costs of the generating plant;
(2) Maximizing the market value of the generating asset or purchase commitment; or
(3) Undertaking other reasonably achievable cost reductions.
g. The board shall conduct a periodic review and, if necessary, adjust the market transition charge or implement other ratemaking mechanisms in order to ensure that the utility will not collect charges that exceed its actual stranded costs.

[(Emphasis added).]
That principle was acknowledged in the testimony of PSE & G's President during the restructuring hearing in May 1998 when he stated that if the generation-related assets appreciated in value during the seven-year period "that money would be used probably first to reduce stranded assets while we had a balance" and then "it would go to the bottom line." However, after the assets are transferred to GENCO, an unregulated affiliate of PSE & G, no "true-up" of value is authorized or contemplated by EDECA and the stranded cost valuation becomes fixed, as do the related customer charges for recovery of stranded costs. Thus, the actual significance of the stranded cost proceeding before the ALJ was not revealed to or appreciated by the parties until months after the hearing had ended, when PSE & G disclosed its intent to transfer its generation-related assets to GENCO.
Petitioners argue persuasively that the BPU's reliance on an ALJ's administrative estimate of the value of the generation-related assets, and its rejection of the request of petitioners to provide current market-based evidence of valuation, resulted in a flawed administrative proceeding *1185 and a result not supported by substantial evidence in the record. That contention is fortified by the BPU's failure to provide any rationale for its selection of ICF's mid-range valuation for PSE & G's assets, and the lack of any opportunity for petitioners or other parties to cross-examine the author of the ICF report or offer rebuttal evidence.
A fundamental principle of administrative law is that agency decisions not only must be based on substantial evidence in the record but also must adequately be explained so that courts are able to discharge their responsibility of judicial review. This Court fully supports that basic principle:
The courts cannot exercise their duty of review unless they are advised of the considerations underlying the action under review. The orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be "clearly disclosed and adequately sustained." "The administrative process will best be vindicated by clarity in its exercise"; judicial review demands that there be "clear indication" that the administrative authority "has exercised the discretion" with which it has been endowed. It is in this wise that conformance to the statutory standard of conduct can be secured.
[In re Plainfield-Union Water Co., 11 N.J. 382, 396, 94 A.2d 673 (1953) (citations omitted).]
See also In re the Issuance of a Permit By the Dep't of Environmental Protection to Ciba-Geigy Corp., 120 N.J. 164, 180, 576 A.2d 784 (1990) ("The findings should be adequately supported by the record and carefully explained.").
Our cases emphasize that when a reviewing court undertakes to consider whether an agency determination is supported by "sufficient credible evidence present in the record," Close v. Kordulak Bros., 44 N.J. 589, 599, 210 A.2d 753 (1965), the
application of this standard requires far more than a perfunctory review; it calls for careful and principled consideration of the agency record and findings. The administrative agency must set forth basic findings of fact supported by the evidence and supporting the ultimate conclusions and final determination so that the parties and any reviewing tribunal will know the basis on which the final decision was reached.
[Riverside Gen. Hosp. v. New Jersey Hosp. Rate Setting Comm'n., 98 N.J. 458, 468, 487 A.2d 714 (1985) (citations omitted).]
Thus, in Public Service Coordinated Transport v. State, 5 N.J. 196, 74 A.2d 580 (1950), this Court set aside a transportation fare rate-increase from five cents to seven cents granted by the Board of Public Utility Commissioners as arbitrary and unreasonable because it was not supported by adequate evidence in the record. We stated:
We are not unaware of the provisions of R.S. 48:2-32, to the effect that the Board is not bound by the technical rules of evidence and is thereby permitted, as indeed are all administrative agencies, to consider matters which might not be admissible in a court of law, without it constituting error. Nevertheless, there must still be sufficient competent evidence in the record to support the reasonableness of the rates arrived at, since a court is of necessity restricted upon a review of the rates fixed by the Board to a consideration of the record before it. If this were not so, the right of an interested party to a review of the Board's determinations would be a meaningless formality, for the decision of the appellate tribunal *1186 under such circumstances would be the result of but guesswork or caprice.

[Id. at 223, 74 A.2d 580.]
In my view, those fundamental principles of administrative law should control the disposition of this issue. Not only was the restructuring hearing mandated by EDECA never held with respect to the transfer of generation-related assets to GENCO, but also the stranded costs hearing before the ALJ was based on the ultimately incorrect premise that PSE & G would retain its generation assets for seven years. Rather than reopen the hearing as requested, and achieve compliance with the letter and spirit of EDECA, the BPU based its stranded cost calculation on stale evidence before the ALJ focused on income projections but omitting any proof of market-based valuations, and relied heavily on the ICF report that never had been subjected to cross-examination or rebuttal. In addition, the BPU utterly failed to provide in its Final Order any explanation for selecting ICF's mid-range figure as the basis for valuing PSE & G's stranded costs. Most disturbing is the fact that the BPU's flawed stranded cost valuation, because of its substantial economic impact on customers over the next fifteen years, in all likelihood was the most significant of all of the factual findings in the Final Report.
Finally, notwithstanding the provisions of the basic generation service contract with GENCO that guaranteed fixed electric generation prices for three years, without adjustment for fuel cost increases, a remand on the stranded costs issue need not disturb the critical provisions of that contract. Obviously, any increase in the value of the generation-related assets transferred to GENCO would have to be reflected in the generation service contract, but the remaining provisions and basic price structure set forth in the contract need not be affected. I have little doubt about the BPU's ability to fashion a remedy for the procedural shortcoming of its stranded cost evaluation process that simultaneously protects the basic interests of PSE & G customers.

IV
One need only read newspaper accounts concerning the current increases in electricity generation costs experienced by utilities in California following that state's initiation of rate deregulation, and the resultant increases in consumer costs, to appreciate the significance and the potential implications of the BPU's exercise of its authority over electric utility deregulation and restructuring. Although deference to the agency's fact-findings and administrative expertise is appropriate, unlawful components of the Final Order that contradict the legislative mandate cannot be permitted to stand merely because their invalidation might alter the balance that the BPU's disposition sought to achieve.
Except for the three grounds on which I would reverse the judgment of the Appellate Division and remand the matter to the BPU, I join in the Court's disposition of this appeal.
For affirmanceChief Justice PORITZ and Justices COLEMAN, LONG and VERNIERO4.
Concurring in part/Dissenting in partJustice STEIN1.
NOTES
[1] EDECA authorized the BPU to (1) "permit competition in the electric generation and gas marketplace" and "thereby reduce the aggregate energy rates currently paid by all New Jersey consumers"; (2)"[p]rovide for regulation of new market entrants in the areas of safe, adequate and proper service and customer protection"; (3) "[r]elieve electric public utilities from traditional utility rate regulation" for services provided in a competitive market; (4) provide electric public utilities "the opportunity to recover above-market power generation and supply costs ... associated with the restructuring of the electric industry"; and (5) "[p]rovide [the BPU] with ongoing oversight and regulatory authority to monitor and review composition of the electric generation and retail power supply marketplace in New Jersey...." N.J.S.A. 48:3-50(c).
[2] The dissent relies on various statements made by the BPU before EDECA was enacted as evidence of the Agency's understanding that the interim five percent rate reduction should be measured from 1997 rates. Post at 1177-78, 167 N.J. at 400-01. That reliance is misplaced. The drafting of EDECA was an ongoing and fluid process, beginning as early as March 1995 and ending with EDECA's passage in February 1999. It is the Agency's Final Order that reflects its final view in respect of the statute's dictates. Further, the BPU's statements are arguably ambiguous and may be read to suggest only that the total reduction must reduce 1997 rates by ten percent. That leaves only the Assembly and Senate Legislative Fiscal Estimate, post at 1178, 167 N.J. at 401, prepared by the Office of Legislative Services, a slender reed on which to overturn the BPU's Final Order.
[3] Joining PSE & G's proposed stipulation of settlement were the New Jersey Transit Corporation, Tosco Refinery Company, New Jersey Commercial Users, Enron Energy Services, Independent Energy Producers of NJ, International Brotherhood of Electrical Workers Local 94 and National Resources Defense Council.
[4] The record is silent on whether ICF Kaiser, the BPU's consultant before the ALJ, is the same entity as ICF Resources Incorporated, the firm that submitted the November 8, 1998 report on which the BPU eventually relied.