45 A.3d 386

IN THE MATTER OF THE PETITION OF RICHARD G. MURPHY II, FOR MANDATORY RELIEF FOR PUBLIC SERVICE ELECTRIC AND GAS COMPANY'S OVERCOLLECTION OF "STRANDED COST" SURCHARGES PURSUANT TO N.J.S.A. 48:3–61.

Superior Court of New Jersey
Appellate Division

Argued May 15, 2012—Decided June 20, 2012.

Before Judges MESSANO, YANNOTTI and ESPINOSA.

*Daniel J. Sponseller* of the Pennsylvania bar, admitted pro hac vice, argued the cause for appellant Richard G. Murphy II (*Michael J. Breslin, Jr., Robert F. Williams,* and *Mr. Sponseller,* attorneys; *Mr. Breslin, Mr. Williams,* and *Mr. Sponseller,* on the brief).

*Matthew M. Weissman* argued the cause for respondent Public Service Electric and Gas Company.

*Carolyn McIntosh,* Deputy Attorney General, argued the cause for respondent New Jersey Board of Public Utilities (*Jeffrey S. Chiesa,* Attorney General, attorney; *Andrea M. Silkowitz,* Assistant Attorney General, of counsel; *Ms. McIntosh, Caroline Vachier,* and *Babette Tenzer,* Deputy Attorneys General, on the brief).

The opinion of the court was delivered by

YANNOTTI, J.A.D.

Richard G. Murphy II (Murphy) appeals from a final determination of the Board of Public Utilities (Board), which denied his petition for relief from certain charges imposed upon ratepayers by Public Service Electric and Gas Company (PSE & G) pursuant to the Electric Discount and Energy Competition Act (EDECA), *N.J.S.A.* 48:3–49 to –98.4. We affirm.

I.

EDECA was enacted in February 1999, and it established a framework for deregulating and restructuring the electric utilities

industry in New Jersey. *L.* 1999, *c.* 23, § 9. Deregulation was intended to "[l]ower the current high cost of energy" for ratepayers, and "[p]rovide diversity in the supply of electric power" by opening New Jersey to competitive markets. *N.J.S.A.* 48:3–50(a)(1), (2), and (7).

To facilitate the creation of this competitive market, EDECA authorized electric utilities to "[f]unctionally separate" their competitive electricity generation assets from their non-competitive assets, and transfer the competitive assets to either an unaffiliated or affiliated third party. *N.J.S.A.* 48:3–59(a). EDECA also authorizes the utility to recover from ratepayers certain costs that it was at risk of losing when the market opened to competition. These costs, which are called "stranded costs," are defined in EDECA as

> the amount by which the net cost of an electric public utility's electric generating assets or electric power purchase commitments, as determined by the [B]oard consistent with the provisions of [EDECA], exceeds the market value of those assets or contractual commitments in a competitive supply marketplace and the costs of buydowns or buyouts of power purchase contracts[.]
>
> [*N.J.S.A.* 48:3–51.]

The amount of stranded costs a utility company could recover from ratepayers was therefore directly related to the market value of the generating assets that the utility transferred to an affiliated or unaffiliated third party. *N.J.S.A.* 48:3–61(e). EDECA required the Board to determine the market value of the transferred assets and, when doing so, "impute all reasonably available measures for the electric public utility to mitigate the quantity of stranded costs, by . . . [m]aximizing the market value of the [transferred] generating asset[.]" *N.J.S.A.* 48:3–61(e) and (f).

EDECA also authorizes the Board to permit an electric utility to collect its eligible stranded costs through various charges on ratepayers. Stranded costs may be recovered through a "non-bypassable [market transition] charge" (MTC) imposed on ratepayers for a period of up to eight years or, in certain circumstances, a longer period of time. *N.J.S.A.* 48:3–61(a) and (i). Stranded costs may also be recovered by financing or securitizing

those costs through the issuance of transition bonds. *N.J.S.A.* 48:3–62(a). The bonds are "secured through an irrevocable bondable stranded cost rate order imposing a non-bypassable transition bond charge" (TBC) upon the utility's ratepayers for a period of up to fifteen years. *N.J.S.A.* 48:3–62(a) and (d).

On August 24, 1999, the Board issued a Final Order approving PSE & G's transfer of its electric generating assets to Genco, an affiliated company that is wholly owned by Public Service Enterprise Group, Inc. The Board authorized PSE & G to collect $2.94 billion in stranded costs.

The Board allowed PSE & G to collect up to $540 million of that amount by imposing a MTC on ratepayers, and to collect $2.4 billion by issuing transition bonds. The Board also authorized a tax "gross-up" of the securitized stranded costs to reflect PSE & G's anticipated tax liabilities associated with those costs. The Board allowed PSE & G to impose a charge called the "MTC–Tax" upon its ratepayers to recover those payments.

The Board's August 24, 1999 Final Order required PSE & G to petition the Board for a bondable stranded costs rate order before it issued transition bonds and imposed the TBC. PSE & G filed the petition. The Board entered an order dated September 17, 1999, granting the petition. That order permitted PSE & G to issue transition bonds and impose a TBC on ratepayers to collect $2.4 billion. The order stated that the TBC charges "authorized herein will become irrevocable upon the issuance of this ... [o]rder" pursuant to *N.J.S.A.* 48:3–65.

Appeals were taken from the Board's August 24, 1999 and September 17, 1999 orders. We affirmed the Board's orders. *In re Pub. Serv. Elec. & Gas Co.'s Rate Unbundling,* 330 *N.J.Super.* 65, 748 *A.*2d 1161 (App.Div.2000). The Supreme Court affirmed our decision. *In re Public Serv. Elect. & Gas Co.'s Rate Unbundling,* 167 *N.J.* 377, 382, 390, 771 *A.*2d 1163, *cert. denied,* 534 *U.S.* 813, 122 *S.Ct.* 37, 151 *L.Ed.*2d 11 (2001).

Following the entry of the August 24, 1999 Final Order, the Board conducted a two-phase audit of the MTCs that PSE & G collected during the initial four-year transition period. The Board determined that PSE & G had over-collected $105.4 million through the MTC. The Board entered an order dated April 22, 2004, which required PSE & G to refund that amount to the ratepayers. Thereafter, the Board conducted another review of the amounts that PSE & G had collected through the MTC, and approved a stipulation of settlement that required PSE & G to refund an additional $122 million to ratepayers.

Meanwhile, in 2007, Murphy filed an action against PSE & G in the Law Division, challenging the constitutionality of EDECA's stranded cost provisions. Murphy alleged, among other things, that EDECA illegally authorized PSE & G to impose "a surcharge for its own benefit on all sales made [by competitors] in its market area", granted "incumbent supplier[s], such as PSE & G, an exclusive right not available to a new competitor", and "prohibit[ed] customers ... [from] switch[ing] to a lower cost competitor". *Murphy v. Pub. Serv. Elec. & Gas Co.*, No. A–1418–07, 2009 *WL* 276540 (App.Div. Feb. 6, 2009). The trial court granted summary judgment to PSE & G and we affirmed. *Ibid.*

On July 10, 2007, Murphy filed a petition with the Board, alleging that PSE & G did not incur the stranded costs the Board anticipated it would incur in its August 24, 1999 Final Order. Murphy asserted that he was pursuing a class action on behalf of the consumers of electricity who had paid or would be required to pay PSE & G the stranded cost charges allowed by the order. Murphy claimed, among other things, that PSE & G had undervalued its assets to obtain a higher amount of stranded costs. He therefore alleged that the charges imposed by PSE & G exceeded the actual stranded costs it incurred. To remedy this alleged over-collection, Murphy asked the Board to (1) amend the August 24, 1999 Final Order or (2) reduce the MTC or retroactively adjust rates that PSE & G charged its consumers.

## II.

On September 20, 2007, PSE & G filed a motion with the Board to dismiss the petition for failure to state a claim upon which relief could be granted pursuant to *N.J.A.C.* 1:1–12.1. Murphy opposed the motion. While the motion was pending, Murphy submitted a supplemental brief to the Board. Thereafter, Murphy submitted an expert report prepared by David J. Effron, a certified public accountant, which challenged the manner in which the Board calculated PSE & G's anticipated federal and state tax liabilities resulting from securitization of the stranded costs. In addition, interested third parties filed motions with the Board to intervene. They supported Murphy's petition.

After receiving additional submissions from the parties, the Board voted at its meeting of June 7, 2010, to grant the motions to intervene and to dismiss Murphy's petition. The Board memorialized its action in a written decision and order dated April 12, 2011.

In that decision, the Board stated that PSE & G's motion had been converted to a motion for summary decision pursuant to *N.J.A.C.* 1:1–12.5, and found that PSE & G was entitled to summary decision as a matter of law. The Board determined that the amount of stranded costs it had permitted PSE & G to recover could not be adjusted retroactively. The Board stated:

[T]he law is clear with respect to the securitized portion of PSE & G's stranded costs, comprising $2.4 billion. The statute reads "each bondable stranded costs rate order and the transition bond charges authorized therein shall become irrevocable upon the issuance of such order and its acceptance by the utility." *N.J.S.A.* 48:3–65(a). Thus, EDECA itself precludes the Board's reopening of that portion of the Final Order under any of the statutory provisions cited by Murphy.

. . . .

The result of our analysis concerning the amount of the non-securitized portion of the stranded costs, the MTC, is the same. When the Board issued its Final Order setting the MTC and PSE & G sold its generation assets to PSE & G Power in accordance with the Final Order, the valuation of those assets was fixed. Once the transaction was consummated, there could be no change in the established value of assets which PSE & G no longer owned.

The Board additionally rejected Murphy's contention that *N.J.S.A.* 48:3–61(g) required it to review and re-determine the

amount of stranded costs PSE & G incurred as a result of the transfer of its generating assets. The Board noted that it had twice reviewed the amounts collected by PSE & G in the form of the MTC and had twice ordered refunds to ratepayers. The Board found that, in doing so, it met its obligation under *N.J.S.A.* 48:3–61(g).

The Board added that it would not reopen its prior stranded costs determination. The Board said that this:

> would substantially erode the principle of finality and require an immeasurable commitment of resources to readjudicate previously resolved issues. This action would be at a substantial expense to the taxpayers, electric companies and the Board, with little expectation ... of return. Also, given the issues raised about "retroactive ratemaking," even a finding as to a change in the calculation might be pyrrhic as the legal right to recover is clearly in question.

> Furthermore, Murphy's approach of treating stranded costs as malleable defies common sense. If the Board were to treat stranded costs like a moving target, there would be no end to stranded cost challenges.

The Board also addressed Murphy's challenge to the MTC–Tax charges. The Board noted that it had considered the Effron report. The Board rejected Murphy's claim that PSE & G's anticipated tax liabilities had been miscalculated, noting that its tax analysis had been upheld by the courts. In addition, the Board rejected Murphy's claim that PSE & G did not incur the anticipated tax liabilities as calculated by the Board. The Board noted that PSE & G had submitted annual reports of its tax liabilities, as required by the September 17, 1999 order. The Board was satisfied that the reports indicated that PSE & G was not over-collecting the MTC–Tax.

III.

On appeal, Murphy argues that the Board erred by granting summary decision in favor of PSE & G. We disagree.

A state administrative agency may render a summary decision when "the papers and discovery which have been filed, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled

to prevail as a matter of law." *N.J.A.C.* 1:1–12.5(b). Here, the Board correctly found that Murphy's claims failed as a matter of law.

▪ The Legislature has delegated broad powers to the Board to regulate public utilities. *In re Pub. Serv. Elect. & Gas Co.'s Rate Unbundling, supra,* 167 *N.J.* at 384, 771 *A.*2d 1163. The Board has " 'broad discretion' " in exercising these powers. *Ibid.* (quoting *In re Pub. Serv. Coordinated Transp.,* 5 *N.J.* 196, 214, 74 *A.*2d 580 (1950)). The Board's decisions are entitled to a presumption of validity and will not be reversed unless shown to be arbitrary, capricious, unreasonable, or beyond the Board's delegated powers. *Id.* at 384–85, 771 *A.*2d 1163.

▪ Here, Murphy argues that he stated claims in his petition for relief under *N.J.S.A.* 48:3–61(g) for $1 billion of the MTC–Tax charges PSE & G was allowed to impose for future tax payments; the $540 million PSE & G was permitted to collect in the form of the MTC; and substantially all of the $2.45 billion that PSE & G was allowed to collect through the TBC. Murphy contends that the Board was required to adjust the amounts that PSE & G was allowed to collect because those amounts exceed PSE & G's actual stranded costs.

As we have explained, EDECA empowers an electric public utility to recover stranded costs created as a result of the introduction of electric power supply competition. The utility may recover its stranded costs through a MTC imposed on its ratepayers. *N.J.S.A.* 48:3–61. The utility also is allowed to recover its stranded costs by issuance of transition bonds secured by "an irrevocable bondable stranded cost rate order" that permits the utility to impose a TBC upon its ratepayers. *N.J.S.A.* 48:3–62(a).

Under EDECA, a utility may only recover stranded costs if it "submit[s] a stranded cost filing to the [B]oard[.]" *N.J.S.A.* 48:3–61(c). "After notice and hearing, the [B]oard may approve, reject or approve with modifications the filing as it deems necessary and appropriate . . . ." *Ibid.* The Board then "issue[s] a stranded cost

recovery order setting forth the amount of stranded costs, if any, eligible to be recovered by such electric public utility." *Ibid.* EDECA provides that the MTC may be imposed for eight years, although the Board may allow the MTC to be imposed for a longer period of time under certain circumstances. *N.J.S.A.* 48:3–61(i). EDECA further provides that:

The [B]oard shall conduct a periodic review and, if necessary, adjust the market transition charge or implement other ratemaking mechanisms in order to ensure that the utility will not collect charges that exceed its actual stranded costs. Net proceeds from the sale or lease of generating assets as provided in [*N.J.S.A.* 48:3–59(d) ] or from the offering of competitive services by the electric public utility or a related competitive business segment of the public utility as provided in [*N.J.S.A.* 48:3–55(b) ], shall be reflected on a timely basis in the first instance by the adjustment of the [MTC] or equivalent rate mechanism implemented pursuant to this subsection. Any adjustment mechanism shall reflect changes in the market price and may reflect other factors such as changes in sales.

[*N.J.S.A.* 48:3–61(g).]

We reject Murphy's argument that *N.J.S.A.* 48:3–61(g) requires the Board to periodically reconsider the amount of stranded costs that it determined in the stranded cost recovery order. That order represents the Board's final determination, rendered after notice and a hearing, of the amount of stranded costs the utility is permitted to recover. While *N.J.S.A.* 48:3–61(g) authorizes the Board to periodically review and adjust the MTC in order to ensure that the utility is not collecting more than is permitted, the statute does not require the Board to reconsider the amount of stranded costs previously determined.

Murphy nevertheless maintains that *N.J.S.A.* 48:3–61(g) requires the Board to undertake a "periodic comparison between . . . the original estimated stranded cost[s] . . . predicted prior to the initiation of competition and . . . the amount of the actual stranded cost losses actually incurred by the utility" thereafter based upon "actual experience." The short answer to this contention is that the statute imposes no such requirement.

EDECA does not call for an award of "estimated" stranded costs. EDECA requires the Board to make a determination of the utility's stranded costs when it enters its stranded cost recov-

ery order. *N.J.S.A.* 48:3–61(g) allows the Board to periodically review the MTC to determine whether the utility is over-charging its ratepayers the amount it was permitted to recover in the stranded cost recovery order. The periodic review contemplated by *N.J.S.A.* 48:3–61(g) is a review of the MTC, not a review of the amount of stranded costs determined by the Board.

As we stated previously, the Board has twice reviewed the amounts collected by PSE & G through the MTC. The Board determined that PSE & G collected $227.4 million more than it was permitted to collect and required PSE & G to return that amount to its ratepayers. The Board did not, however, reconsider the total amount of stranded costs that PSE & G was allowed to recover, nor was it required to do so.

Murphy additionally argues that there was a disputed fact issue as to whether PSE & G paid the securitization-related taxes, as anticipated by the Board. As we noted earlier, the Board's 1999 Final Order authorized PSE & G to collect an MTC–Tax from its ratepayers because PSE & G would be required to pay federal and state taxes as a result of the securitization of a portion of the stranded costs. The Board ordered that the MTC–Tax would be subject to periodic review in order to reconcile the taxes that the utility would actually be required to pay, with adjustments for changes in applicable tax rates.

Murphy did not, however, present any evidence showing that PSE & G has not paid the securitization-related tax liabilities and should not be permitted to recover the entire amount of the MTC–Tax charges that the Board permitted PSE & G to impose. Indeed, as the Board noted in its April 12, 2011 decision, PSE & G has annually submitted tax information to the Board, as required by the Board's September 17, 1999 order. Based on its review of that information, the Board found that PSE & G has not over-collected stranded costs through the MTC–Tax. The record supports the Board's determination.

Moreover, Murphy's claim regarding the MTC–Tax is based, in part, on a challenge to the methodology employed by the Board in

determining the amount by which the stranded costs would be "grossed-up" for securitization-related taxes. In opposing PSE & G's motion to dismiss, Murphy relied upon the Effron report, which criticized the Board's calculation of PSE & G's tax liability. The Board's methodology was, however, affirmed in the appeal challenging the 1999 Final Order. *In re Pub. Serv. Elec. & Gas Co.'s Rate Unbundling, supra,* 330 *N.J.Super.* at 142–43, 748 *A.*2d 1161.

Murphy also argues that there was a disputed issue of fact as to the $540 million of stranded costs that PSE & G was permitted to recover through the MTC. Murphy contends that PSE & G has collected "hundreds of millions of dollars" for expected future stranded costs that it did not actually incur. Murphy asserts that the Board based the amount of stranded costs in part upon PSE & G's projection that it would generate about $46 million in net revenue from its power plants but, according to Murphy, the power plants "subsequently generated hundreds of millions of dollars of net revenues."

As the Board recognized, however, Murphy was essentially seeking a revaluation of the generating assets that PSE & G had transferred to its affiliated company. The Board noted that when it issued its 1999 Final Order, "the valuation of those assets was fixed." The Board observed that "[o]nce the transaction was consummated, there could be no change in the established value of assets which PSE & G no longer owned."

The Board also noted that if the value of PSE & G's assets declined after their transfer, neither PSE & G nor its assignee could petition the Board for a new stranded cost determination. The Board said that Murphy was seeking reimbursement for alleged over-earnings by PSE & G based on valuations established years ago. The Board concluded that Murphy was not entitled to such relief under EDECA. We agree.

Murphy additionally argues that he raised a disputed issue of fact as to whether the Board should adjust the TBC. He contends that the $2.4 billion PSE & G was permitted to collect through the

TBC is more than the "actual" stranded costs that PSE & G has since incurred. The Board found that this claim was barred by *N.J.S.A.* 48:3–65(a), which provides in part that, "[n]otwithstanding any other provision of law, each bondable stranded costs rate order and the [TBCs] authorized therein shall become irrevocable upon the issuance of such order and its becoming effective pursuant to [*N.J.S.A.* 48:3–68]."

Murphy contends that *N.J.S.A.* 48:3–65(a) is inapplicable because he is not seeking to stop payments to holders of the transition bonds, which he says is all the statute was intended to protect. The Board said that Murphy's argument misses the point. The Board stated that Murphy was seeking

> reimbursement from PSE & G based on a revaluation of the assets which are the subject of the irrevocable orders. Whether the flow of payments to bondholders is stopped or not is irrelevant. The statutory mandate prohibits revocation of the [TBC]. If PSE & G were required to satisfy out of its own pocket (or that of its affiliate) the alleged windfalls stemming from the $2.4 billion [TBC], it would constitute a change to the bondable stranded costs rate order, which is prohibited.

Again, we agree. Although *N.J.S.A.* 48:3–65(b) allows the Board to adjust the TBC under certain limited circumstances, it does not authorize the sort of reimbursement that Murphy was seeking here. The statute provides:

> Neither the [B]oard nor any other governmental entity shall have the authority, directly or indirectly, legally or equitably, to rescind, alter, repeal, modify or amend a bondable stranded costs rate order, to revalue, re-evaluate or revise the amount of bondable stranded costs, to determine that the [TBC] or the revenues required to recover bondable stranded costs are unjust or unreasonable, or in any way to reduce or impair the value of bondable transition property, nor shall the amount of revenues arising with respect thereto be subject to reduction, impairment, postponement or termination, provided, however, that nothing in this section shall preclude adjustments of the [TBC] in accordance with the provisions of [*N.J.S.A.* 48:3–64(a)(2) and (b) ].

*N.J.S.A.* 48:3–64(a)(2) and (b) require the Board to adjust the TBC under certain circumstances. The Board must adjust the TBC "in a manner approved by the [B]oard of the initial [TBC] prior to the closing of the related transition bonds to reflect the actual rate of interest thereon and all other costs, including any required overcollateralization, associated with the issuance of such

transition bonds[.]" *N.J.S.A.* 48:3–64(a)(2). In addition, the Board must

> provide for mandatory periodic adjustments by the [B]oard of the [TBC] that are the subject of the bondable stranded costs rate order, upon petition of the affected electric public utility, its assignee or financing entity, to conform the [TBC] to the schedule of payments of principal and interest on the transition bonds provided to the [B]oard by the electric public utility pursuant to [*N.J.S.A.* 48:3–64(a) ].
>
> [*N.J.S.A.* 48:3–64(b).]

In this matter, Murphy was not seeking an adjustment to the TBC to reflect the actual rate of interest on the transition bonds. *N.J.S.A.* 48:3–64(a)(2). Furthermore, Murphy is not the "affected public utility, its assignee or financing entity" and, therefore, he may not seek relief under *N.J.S.A.* 48:3–64(b). Moreover, the Board correctly determined that Murphy was essentially seeking to alter the previously-issued bondable stranded costs rate order and revalue PSE & G's transferred assets. The Board correctly found that *N.J.S.A.* 48:3–65(a) bars any such relief.

In addition, Murphy argues that the Board erred by converting PSE & G's motion to dismiss to a motion for summary decision. Murphy contends that the Board should have provided the parties with an opportunity to conduct discovery and submit further evidence in opposition to PSE & G's motion. We are convinced that this argument is without sufficient merit to warrant extended discussion. *R.* 2:11–3(e)(1)(E).

Suffice it to say that, whether styled as a motion to dismiss for failure to state a claim pursuant to *N.J.A.C.* 1:1–12.1, or a motion for summary decision under *N.J.A.C.* 1:1–12.5(b), PSE & G's motion was essentially based on the contention that Murphy's claims were barred as a matter of law. We are satisfied that Murphy was afforded a full and fair opportunity to address that argument.

Affirmed.