NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-2232-22

IN THE MATTER OF THE
COMPETITIVE SOLAR
INCENTIVE ("CSI") PROGRAM
PURSUANT TO P.L. 2021, C.169.

_____

> **APPROVED FOR PUBLICATION**
>
> **April 23, 2024**
>
> **APPELLATE DIVISION**

Submitted April 15, 2024 – Decided April 23, 2024

Before Judges Sabatino, Mawla, and Vinci.

On appeal from the New Jersey Board of Public
Utilities, Docket No. QO21101186.

Bevan, Mosca & Giuditta, PC, attorneys for appellant
Mid-Atlantic Renewable Energy Coalition (William
K. Mosca, Jr., and Jennifer McCave, on the briefs).

Matthew J. Platkin, Attorney General, attorney for
respondent New Jersey Board of Public Utilities
(Donna Sue Arons, Assistant Attorney General, of
counsel; Brandon Cole Simmons, Deputy Attorney
General, on the brief).

Brian O. Lipman, Director, Division of Rate Counsel,
attorney for respondent New Jersey Division of Rate
Counsel (Sarah H. Steindel, Assistant Deputy Rate
Counsel, on the brief).

The opinion of the court was delivered by

MAWLA, J.A.D.

Appellant Mid-Atlantic Renewable Energy Coalition (MAREC) appeals from a February 17, 2023 final agency decision by the New Jersey Board of Public Utilities denying reconsideration of the Board's order establishing siting requirements for its Competitive Solar Incentive (CSI) program, pursuant to the Solar Act of 2021, N.J.S.A. 48:3-114 to -120. We affirm.

On June 9, 2021, Governor Phil Murphy signed the Act to incentivize increased solar development in New Jersey. The Act directs the Board to create a solar facilities program "with administratively set incentive values, and a solicitation process for awarding contracts for grid supply solar facilities and net metered solar facilities greater than five megawatts." In re Competitive Solar Incentive ("CSI") Program, No. QO21101186, 2022 N.J. PUC LEXIS 367, at 13-14 (Bd. of Pub. Utils. Dec. 7, 2022). See also N.J.S.A. 48:3-114.

The Legislature codified its findings and declarations as well as the goals of the Act, namely: (1) achieving fifty percent of the State's electricity supply from renewable energy by 2030; and (2) developing a "grid supply solar . . . directed toward marginal land and the built environment" and "a coordinated land use policy for grid supply solar siting . . . to affordably expand New Jersey's commitment to renewable energy while not

compromising the State's commitment to preserving and protecting open space and farmland."  N.J.S.A. 48:3-114(a), (c).

Pursuant to this authority, the Board began to develop the CSI program, and as part of the process worked with the New Jersey Department of Environmental Protection (DEP), the Department of Agriculture, and the State Agriculture Development Committee (SADC) to issue recommendations and a straw proposal on siting requirements.  The Board retained an expert, engaged in "[four] years of extensive stakeholder engagement," and solicited comments from stakeholders regarding the siting straw.  The process culminated in the issuance of a December 7, 2022 order that launched the CSI Program.  The order contained several staff recommendations regarding the CSI Program design, registration, construction, and an extensive discussion regarding siting, which the Board adopted.

At the outset, the December 2022 order noted the Act required it to balance the need for developing "large-scale grid supply solar development" with the "risk of unintended impacts to vulnerable farmland and open space, which is already under significant development pressure."  The Act "directed the Board to 'minimize, as much as practicable, potential adverse environmental impacts[,]' and lays out specific siting criteria to be applied to all . . . 'CSI-eligible facilities.'"  The Board's order noted:

A-2232-22

The siting criteria reflect where it is permissible for solar projects to be located, where solar construction is subject to restrictions, and where it is prohibited. For some prohibited locations, the Act allows the Board to grant a waiver if it deems . . . the project to be in the public interest.

The siting criteria for solar projects are codified in N.J.S.A. 48:3-119.

N.J.S.A. 48:3-119(c) enumerates seven categories of land where solar facilities shall not be sited and in relevant part states:

Unless authorized pursuant to subsection f. of this section, a grid supply solar facility or a net metered solar facility greater than five megawatts in size shall not be sited on:

. . . .

(7) prime agricultural soils and soils of Statewide importance, as identified by the United States Department of Agriculture's Natural Resources Conservation Service, which are located in Agricultural Development Areas certified by the [SADC], in excess of the Statewide threshold of 2.5[%] of such soils established by paragraph (1) of subsection d. of this section.

[N.J.S.A. 48:3-119(c)(7) (emphasis added).]

N.J.S.A. 48:3-119(d)(1) states:

A grid supply solar facility or a net metered solar facility greater than five megawatts in size sited on prime agricultural soils or soils of Statewide importance, as identified by the United States Department of Agriculture's Natural Resources Conservation Service, which are located in

4

Agricultural Development Areas certified by the [SADC], shall not require a waiver pursuant to subsection f. of this section until the [B]oard determines, pursuant to paragraph (2) of this subsection, that 2.5[%] of such lands in the State have been approved by the [B]oard pursuant to P.L.2021, c.169 (C.48:3-114 et al.) to be utilized by a grid supply solar facility or a net metered solar facility greater than five megawatts in size. After the [B]oard makes this determination, a grid supply solar facility or a net metered solar facility greater than five megawatts in size shall not be sited on prime agricultural soils or soils of Statewide importance, as identified by the United States Department of Agriculture's Natural Resources Conservation Service, which are located in Agricultural Development Areas certified by the [SADC], unless authorized pursuant to subsection f. of this section.

[Emphasis added.]

N.J.S.A. 48:3-119(f) describes the waiver process, and as regards the issues raised here, states:

A developer may petition the [B]oard for a waiver to site a solar power electric generation facility in an area proscribed by subsection c. of this section. . . . However, in no case shall the projects approved by the [B]oard pursuant to this section occupy more than [5%] of the unpreserved land containing prime agricultural soils and soils of Statewide importance, as identified by the United States Department of Agriculture's Natural Resources Conservation Service, located within any county's designated Agricultural Development Area, as determined by the [SADC].

[Emphasis added.]

A-2232-22

The Board's December 2022 order noted N.J.S.A. 48:3-119(d)(1) and N.J.S.A. 48:3-119(f) both "specify restrictions for the development of CSI-eligible facilities on specific agricultural land." However, it concluded CSI-eligible facilities should "not be allowed to register with the Board and pursue development if the aggregate solar development on covered agricultural lands[1] exceeds 2.5% of such lands Statewide." Further, N.J.S.A. 48:3-119(f) should "be implemented independently and . . . CSI-eligible facilities shall not be allowed to register with the Board if the aggregate solar development on unpreserved covered agricultural land within a specific county exceeds 5% of such lands in the county." The Board concluded "the [S]tatewide cap is . . . to be calculated by looking at preserved and unpreserved farmland, while the per[]county cap is proposed to be calculated on the basis of unpreserved farmland only."

The Board's order noted that in consultation with other State agencies, it could consider "petitions for waivers that seek construction of CSI-eligible facilities . . . in excess of the 2.5% Statewide threshold for solar development on covered agricultural land." However, the Act "does not permit waivers of

---

[1] "Covered agricultural lands" include unpreserved prime agricultural soils and soils of Statewide importance located in agricultural development areas. In re Competitive Solar Incentive ("CSI") Program, No. QO21101186, 2022 N.J. PUC LEXIS 367, at 9 (Bd. of Pub. Utils. Dec. 7, 2022).

the 5% per[]county limit. N.J.S.A. 48:3-119(f)." It concluded "projects proposed to be constructed on preserved farmland, or exceeding the 5% county concentration limit, are not eligible for a waiver" and should be denied.

MAREC moved for reconsideration, and relevant to the issues raised on this appeal, argued the Board misinterpreted the controlling statutory limitations on the siting of solar projects on covered agricultural lands. It claimed the Board's order misread the plain language of N.J.S.A. 48:3-119(f), because that statute states the 5% per county limit only applied to solar projects that sought a waiver to be sited on lands restricted under N.J.S.A. 48:3-119(c), including lands exceeding the 2.5% Statewide limit. MAREC argued the 2.5% Statewide limit governed all projects. Therefore, a project could exceed the 5% county limit if it does not exceed the 2.5% Statewide limit and is not built on the lands proscribed in N.J.S.A. 48:3-119(c). MAREC claimed the legislative history also supported its reading of the Act.

The Board was unpersuaded. It held "[a]ll CSI-Eligible Facilities must meet the siting criteria established pursuant to [N.J.S.A. 48:3-119(f)]. . . . This ensures that the State's interest in preserving open space and agricultural lands will be applied to all solar projects, on an equal basis." The Board cited the "in no case" portion of N.J.S.A. 48:3-119(f), and concluded the statute prohibits "projects that would result in excess of 5% of covered agricultural

lands in a particular county, which includes both through the waiver process as well as the underlying requirement." It found N.J.S.A. 48:3-119(f)'s "restrict[ion on] development . . . serves to underscore the Legislature's goal of ensuring that encouraging large scale solar development does not . . . undermine the State's agricultural industry and to cabin the Board's use of the waiver process."

The Board reiterated its finding from the December 2022 order that "the 5% county concentration limit is a separately enforceable statutory requirement." It pointed out the Act "specifically excludes preserved farmland from the . . . 5[%] [c]ounty [c]oncentration [l]imit, but does not exclude preserved land in the . . . 2.5[%] Statewide threshold. . . . In both cases, the statute directed the Board to limit solar development to 5[%] of covered agricultural lands." The Board concluded "its interpretation of these statutory provisions struck an appropriate balance between facilitating development and safeguarding New Jersey's agricultural heritage and open space."

I.

On appeal, MAREC repeats its argument the 5% county limit in N.J.S.A. 48:3-119(f) only applies when a project would exceed the 2.5% Statewide limit or is subject to the other limiting criteria set forth in N.J.S.A. 48:3-119(c). In other words, if a project does not exceed the 2.5% Statewide limit and will not

be built on lands proscribed by N.J.S.A. 48:3-119(c), MAREC asserts "it can be built on land containing prime agricultural soils and soils of Statewide importance regardless of whether it will exceed the 5% county concentration limit."

MAREC claims the plain reading of the statute supports its interpretation because the phrase "approved by the Board" in N.J.S.A. 48:3-119(f) refers to the waiver process, which it is not seeking. Further, the December 2022 order confirms this interpretation because it provides only projects seeking a waiver will need affirmative siting approval from the Board, and the tracking and recording of the Statewide and county limits will occur annually, instead of on an individual project basis.

MAREC also points to the structure of the statute. Although it acknowledges N.J.S.A. 48:3-119(f) states, "in no case shall the projects approved . . . pursuant to this section" exceed the 5% county limit, suggesting the limit is not confined to the waiver process described in N.J.S.A. 48:3-119(f), it asserts the word "section" in that passage is a "mere scrivener's error." It notes the 2.5% Statewide limit and the 5% county limit reside in separate sections. Therefore, if the Legislature had intended for the 5% county limit to serve as an additional limitation on all CSI-eligible projects (not just those seeking a waiver) it would have been enumerated in N.J.S.A. 48:3-

119(c) or (e). Further, the Legislature's use of the words "after" and "unless" in N.J.S.A. 48:3-119(d)(1) as in: "After the [B]oard makes this determination, a [solar facility] . . . shall not be sited on [farmlands] . . . unless authorized pursuant to [N.J.S.A. 48:3-119(f)]" indicate the 2.5% Statewide limit is a condition precedent to applying the 5% county limit.

MAREC argues the legislative history also supports its interpretation of the statute. It cites the Assembly and Senate committee statements accompanying passage of the Act, both of which state: "After the 2.5[%] threshold is reached, a waiver would be required for the remaining 2.5[%] of the lands with agricultural soils until the [5%] cap on the use of lands with those soils for solar facilities is reached." Assemb. Budget Comm. Statement to A. 4554, at 3 (June 22, 2021); S. Budget & Appropriations Comm. Statement to S. 2605, at 3 (June 22, 2021). MAREC avers these statements are dispositive because the earliest version of the bill required waivers for all CSI-eligible projects sited on covered agricultural lands and the 5% county concentration limit. The bill was then revised to allow projects on covered agricultural lands up to the 2.5% Statewide limit without a waiver. Therefore, because this change made the statute less restrictive on solar development of covered agricultural lands, the statute should be construed liberally.

A-2232-22

We will ordinarily defer to an agency's reasonable construction of statutes it is charged with implementing. In re Implementation of L. 2012, C. 24, N.J.S.A. 48:3-87(t), 443 N.J. Super. 73, 78 (App. Div. 2015) (citing In re Pub. Serv. Elec. & Gas Co.'s Rate Unbundling, 167 N.J. 377, 384 (2001)). However, we are not bound to an agency's interpretation of a statute and our review in this regard is always de novo. L.A. v. Bd. of Educ. of Trenton, Mercer Cty., 221 N.J. 192, 204 (2015).

## II.

"The goal in cases of statutory construction is . . . to seek and give effect to the Legislature's intent." Nw. Bergen Cnty. Utils. Auth. v. Donovan, 226 N.J. 432, 443-44 (2016). "[T]he best indicator of that intent is the statutory language." DiProspero v. Penn, 183 N.J. 477, 492 (2005). "'Only if there is ambiguity in the statutory language will we turn to extrinsic evidence,' including legislative history." In re Implementation of L. 2018, C. 16 Regarding the Establishment of Zero Emission Certificate Program for Eligible Nuclear Power Plants, 467 N.J. Super. 154, 179 (2021) (quoting Richardson v. Bd. of Trs., Police & Firemen's Ret. Sys., 192 N.J. 189, 195-96 (2007)).

"We ascribe to the statutory words their ordinary meaning and significance . . . ." DiProspero, 183 N.J. at 492. "We generally do not assume the Legislature intended anything other than the plain language of the statute."

State v. Burnham, 474 N.J. Super. 226, 231 (App. Div. 2022) (citing Zabilowicz v. Kelsey, 200 N.J. 507, 517 (2009)).  "The Legislature knows how to draft a statute to achieve [a] result when it wishes to do so."  Zabilowicz, 200 N.J. at 517.

Our de novo review of the record convinces us N.J.S.A. 48:3-119(f) is unambiguous and the Board correctly interpreted the Act.  N.J.S.A. 48:3-119(f) clearly states "in no case shall the projects approved by the [B]oard pursuant to this section occupy more than [5%] of the unpreserved land containing prime agricultural soils and soils of Statewide importance . . . located within any county's designated Agricultural Development Area . . . ."  The "section" referenced in N.J.S.A. 48:3-119(f) intends all of N.J.S.A. 48:3-119, not only subsection (f), which enumerates the waiver process.  Therefore, the plain and ordinary meaning of the text indicates the per county limit is not eligible for the waiver process.

MAREC presents no evidence to suggest the use of the term "section" is a scrivener's error.  Indeed, the first sentence of N.J.S.A. 48:3-119(f) authorizes the waiver process for projects "proscribed by subsection c" and its later emphasis that "in no case shall" projects be approved in violation of the per county limit makes clear the limit is strict and unwaivable.  The Statewide

and the county limits are contained in separate subsections of N.J.S.A. 48:3-119, but they are not in separate sections of the Act.

N.J.S.A. 48:3-119 repeatedly refers to its subsections and to the greater span of N.J.S.A. 48:3-119 itself. For example, it states: "In addition to implementing the provisions of subsections c. through f. of this section, the siting criteria shall" follow certain guidelines. N.J.S.A. 48:3-119(b). N.J.S.A. 48:3-119(c)(7) provides:

> Unless authorized pursuant to subsection f. of this section, a grid supply solar facility or a net metered solar facility greater than five megawatts in size shall not be sited on . . . prime agricultural soils and soils of Statewide importance . . . in excess of the Statewide threshold of 2.5[%] of such soils established by paragraph (1) of subsection d. of this section.

And N.J.S.A. 48:3-119(g) states: "[T]he [B]oard . . . shall conduct a review of the rules and regulations to assess program performance, identify problems, and recommend changes to the siting criteria to better effectuate the policy goals set forth in subsection a. of this section."

Therefore, the Legislature's use of the term "section" in N.J.S.A. 48:3-119(f) in discussing the per county limit was plainly intentional and not scrivener's error. A contrary interpretation would undermine the Act's intent to limit the adverse effects of solar projects on our State's natural resources. The

13

proper statutory construction is that the per county limit is strict and unwaivable.

We also construe a statute's words "in context with related provisions so as to give sense to the legislation as a whole." DiProspero, 183 N.J. at 492. N.J.S.A. 48:3-119(d)(1) states solar projects "shall not require a waiver pursuant to subsection f. of this section until the [B]oard determines, . . . that 2.5[%] of such lands in the State have been approved by the [B]oard." Yet, the Legislature made no mention of the ability to seek a waiver of the 5% county limit in N.J.S.A. 48:3-119(f). Therefore, despite N.J.S.A. 48:3-119(d)(1)'s use of the word "until," it is not reasonable to interpret the Statewide limit as a precondition to applying the per county limit because it is a precondition for the waiver process, which is not applicable to the per county limit. It is self-evident the Legislature intended not to constrain solar development while the Board was establishing the 2.5% Statewide benchmark. The Legislature could do this because it put the 5% per county limit in place, thereby permitting simultaneous solar development without detriment to a county's agricultural lands.

N.J.S.A. 48:3-119(d)(1) also states that "[a]fter the [B]oard" has approved projects up to the Statewide limit, no more projects will be "sited on prime agricultural soils or soils of Statewide importance . . . unless authorized

14

pursuant to subsection f. of this section."  MAREC suggests the use of "after" and "unless" supports its argument, but this language does not indicate the per county limit is subject to meeting the Statewide threshold because the per county limit is unwaivable.  The qualifiers, "until," "after," and "unless" relate to preconditions for the waiver process itself, which does not apply to the county limit.

Notably, N.J.S.A. 48:3-119(d)(1) references N.J.S.A. 48:3-114, which enumerates the goals of the Act.  Interpreting the Act in the manner suggested by MAREC would undermine the Legislature's intent that "[t]he development of grid supply solar should be directed toward marginal land and the built environment . . . [and] coordinat[ing] land use policy for grid supply solar siting . . . to affordably expand New Jersey's commitment to renewable energy while not compromising the State's commitment to preserving and protecting open space and farmland."  N.J.S.A. 48:3-114(c).

Finally, "[a] court should not 'resort to extrinsic interpretative aids' when 'the statutory language is clear and unambiguous, and susceptible to only one interpretation.'"  DiProspero, 183 N.J. at 492 (quoting Lozano v. Frank DeLuca Const., 178 N.J. 513, 522 (2004)).  Because the plain language of the Act is clear, we decline to interpret it using the legislative statements cited by MAREC.

Even so, when the legislative history is taken in context, it does not convince us of MAREC's viewpoint. Initially, we note the legislative history reiterates the goal of solar development is to "minimize, as much as is practicable, potential adverse environmental impacts." S. Appropriations Comm. Statement to S. 2605, at 4 (May 11, 2021).

MAREC suggests the legislative history supports its interpretation of the Act because the earliest version of the bill required waivers for all CSI-eligible projects sited on covered agricultural lands and the final version only required waivers after the 2.5% Statewide limit was reached. However, in both versions of the bill, the per county limit remained the same and was not subject to the waiver process. S. 2605 § 6(e) (2021); S. 2605 § 6(f) (2021) (first reprint). Therefore, assuming consultation of the legislative history is appropriate here, it only underscores the Board's finding the Statewide and county limits are independent of one another.

This is because the Statewide and the county limits do not contemplate the same farmland. N.J.S.A. 48:3-119(f) employs the "unpreserved" qualifier for the county limit only, whereas the Statewide limit does not. This difference shows why reading the provisions separately is sensible; to do otherwise could lead to up to 100% of a county's farmland with prime soils or soils of Statewide importance being eligible for solar development because the

2.5% Statewide limit has not yet been reached. Indeed, according to the Board's December 2022 order, the 2.5% Statewide threshold equaled 8,493 acres of the State's prime farmland soils and soils of Statewide importance. The county with the greatest agricultural acreage equating 5% of the development limit was Salem at 1,653 acres. Ignoring the 5% county limit, in Salem County's case, and allowing development up to the Statewide limit, would swallow the county's agricultural acreage. Interpreting the statute in this manner leads to an absurd result, which we must avoid.

Since 1867 New Jersey has been known as the Garden State because of the State's farmlands and agricultural bounty. Manual of the Legislature of New Jersey 13 (2021). In 2017, the Garden State moniker became the official state slogan. A. 3437 (2017).

According to the New Jersey Department of Agriculture, vegetable crops produced in 2022 were valued at $240 million. 2023 N.J. Dep't of Agric. Ann. Rep. 29. New Jersey is third in the nation for producing cranberries and bell peppers, id. at 28, and "regularly among the top five producers" of blueberries, tomatoes, and peaches, id. at 16. Together, New Jersey farms produced $1.1 billion in direct sales, had a $1.9 billion economic impact, and were responsible for creating 22,772 jobs in 2020. Farm Credit E., Ne. Econ. Engine: Agric., Forest Prods., and Com. Fishing 15 (3d ed. 2020).

Fifteen percent of the State comprises farmland of one sort or another. 2022 USDA Census of Agric.: U.S. Summary & State Data 340. In 2022, the United States Department of Agriculture recorded just over 700,000 acres of farmland. Ibid. This figure represented an approximate 100,000-acre decline from the farmland acreage recorded in 2007. 2017 USDA Census of Agric.: U.S. Summary & State Data 7.

The Act seeks to preserve these vital natural resources while encouraging the likewise important and rising development of clean solar energy. Our review of the record convinces us the Board's interpretation of the Act justifiably balanced these important considerations in a manner faithful to the statute's text.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION